Gene MILLER, Plaintiff-Appellee,

v.

UNIVERSAL CITY STUDIOS, INC., et al., Defendants-Appellants.

No. 78-3772.

United States Court of Appeals, Fifth Circuit.

July 23, 1981.

---

Barry R. Davidson, Miami, Fla., Youngman, Hungate & Leopold, Louis P. Petrich, Los Angeles, Cal., for defendants-appellants.

Fine, Jacobson, Block & Semet, Irwin J. Block, Joseph H. Serota, Miami, Fla., Arthur R. Miller, Cambridge, Mass., for plaintiff-appellee.

Before RONEY, HILL and KRAVITCH, Circuit Judges.

RONEY, Circuit Judge:

A sensational kidnapping, committed over a decade ago, furnishes the factual backdrop for this copyright infringement suit. The issue is whether a made-for-television movie dramatizing the crime infringes upon a copyrighted book depicting the unsuccessful ransom attempt. After careful and lengthy study and consideration, we conclude that the verdict for plaintiff must be reversed and the cause remanded for a new trial because at the request of plaintiff and over defendants' objection, the case was presented and argued to the jury on a false premise: that the labor of research by an author is protected by copyright.

The decision to reverse is made more difficult because the record and the arguments to this Court reveal sufficient evidence to support a finding of infringement and a verdict for plaintiff under correct theories of copyright law. Plaintiff's presentation and argument to the jury, however, make it improper to conclude that the short erroneous instruction, imbedded in a field of proper instructions, was harmless error.

### Facts

The facts are fully developed in the district court's opinion, *Miller v. Universal City Studios, Inc.*, 460 F.Supp. 984 (S.D.Fla. 1978). A synopsis will suffice for purposes of this appeal.

In December 1968 the college-aged daughter of a wealthy Florida land developer was abducted from an Atlanta motel room and buried alive in a plywood and fiberglass capsule. A crude life-support system kept her alive for the five days she was underground before her rescue. Gene Miller, a reporter for the *Miami Herald*, covered the story and subsequently collaborated with the victim to write a book about the crime. Published in 1971 under the title *83 Hours Till Dawn*, the book was copyrighted along with a condensed version in *Reader's Digest* and a serialization in the *Ladies Home Journal*. The co-author has assigned her interest in this litigation to Miller.

In January 1972 a Universal City Studios (Universal) producer read the condensed version of the book and thought the story would make a good television movie. He gave a copy of the book to a scriptwriter, who immediately began work on a screenplay. Although negotiations for purchase of the movie rights to *83 Hours Till Dawn* were undertaken by Universal, no agreement with Miller was ever reached. The scriptwriter was eventually advised that use of the book in completing the script was "verboten." The movie was completed, however, and aired as an ABC Movie of the Week, *The Longest Night.*

The evidence at trial was conflicting on whether the scriptwriter relied almost entirely on the book in writing the screenplay or whether he arrived at his version of the kidnapping story independently. Both plaintiff and his expert witness testified to numerous similarities between the works. The jury, which had copies of the book and viewed the movie twice during the trial, found the movie infringed Miller's copyright and awarded him over $200,000 in damages and profits.

The most substantial question presented on appeal is whether the district court erred

in instructing the jury that "research is copyrightable." Because the Court finds reversible error in this regard, other issues raised on this appeal will be discussed only as necessary to avoid further confusion on retrial.

### Is Research Copyrightable?

The district court instructed the jury that if an author engages in research on factual matters, "his research is copyrightable." This instruction, at best confusing, at worst wrong, was given with some reluctance by the trial court over the strenuous objection of defendants on the urging by plaintiff, "That's the heart of the case."

As it develops on appeal, plaintiff may have won without the instruction, but later explanation by the trial court and the brief on appeal convinces this Court that the idea conveyed to the jury by the court and trial counsel contained an erroneous view of the law. In context, the instruction is found in this portion of the extended jury charge:

Copyrightability is best defined in terms of what can and cannot be copyrighted. Ideas can never be copyrighted. Only the particular expression of an idea can be copyrighted. A general theme cannot be copyrighted but its expression throughout the pattern of the work, the sequence of its events, the development of the interplay of its characters, and its choice of detail and dialogue can be copyrighted. If, however, the expression of the idea necessarily follows from the idea to such an extent that the idea is capable of expression only in a more or less stereotyped form, it is not copyrightable.

Similarly, in a case like the instant one, which deals with factual matters such as news events, the facts themselves are not copyrightable but the form of expression of the facts and their arrangement and selection are copyrightable. *Moreover, if an author, in writing a book concerning factual matters, engages in research on those matters, his research is copyrightable.* As was the case with ideas, if the expression arrangement and selection of the facts must necessarily, by the nature of the facts, be formulated in given ways then they are not copyrightable. (Challenged instruction underlined).

■ It is well settled that copyright protection extends only to an author's expression of facts and not to the facts themselves.[1] *See, e. g., Rosemont Enterprises, Inc. v. Random House, Inc.,* 366 F.2d 303, 309 (2d Cir. 1966), *cert. denied,* 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967); *Chicago Record-Herald Co. v. Tribune Association,* 275 F. 797, 798–99 (7th Cir. 1921); *Alexander v. Haley,* 460 F.Supp. 40, 45 (S.D. N.Y.1978); *Lake v. Columbia Broadcasting System,* 140 F.Supp. 707, 708–09 (S.D.Cal. 1956). This dichotomy between facts and their expression derives from the concept of originality which is the premise of copyright law. Under the Constitution, copyright protection may secure for a limited time to "Authors ... the exclusive Right to their respective Writings." U.S.Const. Art. I, § 8, cl. 8. An "author" is one "to whom anything owes its origin; originator; maker; one who completes a work of science or literature." *Burrow-Giles Lithographic Co. v. Sarony,* 111 U.S. 53, 58, 4 S.Ct. 279, 281, 28 L.Ed. 349 (1884). Obviously, a fact does not originate with the author of a book describing the fact. Neither does it originate with one who "discovers" the fact. "The discoverer merely finds and records. He may not claim that the facts are 'original' with him although there may be originality and hence authorship in the manner of reporting, i. e., the 'expression,' of the

---

1. Similarly, a copyright protects only the expression of ideas and not the ideas. The idea-expression dichotomy was given express statutory recognition in the 1976 Copyright Act. Section 102(b) provides: "In no case does copyright protection for an original work of authorship extend to any idea, procedure, process, system, method of operation, concept, principle, or discovery, regardless of the form in which it is described, explained, illustrated, or embodied in such a work." 17 U.S.C.A. § 102(b).

facts." 1 M. Nimmer, *Nimmer on Copyright* § 2.03[E], at 2–34 (1980). Thus, since facts do not owe their origin to any individual, they may not be copyrighted and are part of the public domain available to every person.

The district court's charge to the jury correctly stated that facts cannot be copyrighted. Nevertheless, in its order denying defendants' motion for a new trial the court said it viewed "the labor and expense of the research involved in the obtaining of those uncopyrightable facts to be intellectually distinct from those facts and more similar to the expression of the facts than to the facts themselves." *Miller v. Universal City Studios, Inc.*, 460 F.Supp. at 987. The court interpreted the copyright law to reward not only the effort and ingenuity involved in giving expression to facts, but also the efforts involved in discovering and exposing facts. In its view, an author could not be expected to expend his time and money in gathering facts if he knew those facts, and the profits to be derived therefrom, could be pirated by one who could then avoid the expense of obtaining the facts himself. Applying this reasoning to the case at bar, the court concluded "[i]n the age of television 'docudrama' to hold other than research is copyrightable is to violate the spirit of the copyright law and to provide to those persons and corporations lacking in requisite diligence and ingenuity a license to steal." *Id.* at 988.

Thus the trial court's explanation of its understanding of its charge undercuts the argument to this Court that the word "research" was intended to mean the original expression by the author of the results of the research, rather than the labor of research.

The issue is not whether granting copyright protection to an author's research would be desirable or beneficial, but whether such protection is intended under the copyright law.[2] In support of its instruction, the district court cited a number of cases, one of which involved the use of another's historical research in writing a literary work.[3]

■ It is difficult to adequately distinguish some of the directory cases, and particularly the language of the opinions. *See Schroeder v. William Morrow & Co.*, 566 F.2d 3 (7th Cir. 1977); *Adventures in Good Eating, Inc. v. Best Places to Eat, Inc.*, 131 F.2d 809 (7th Cir. 1942); *Leon v. Pacific Telephone & Telegraph Co.*, 91 F.2d 484 (9th Cir. 1937); *Jeweler's Circular Publishing Co. v. Keystone Publishing Co.*, 281 F. 83 (2d Cir.), *cert. denied*, 259 U.S. 581, 42 S.Ct. 464, 66 L.Ed. 1074 (1922); *Southwestern Bell Telephone Co. v. Nationwide Independent Directory Service, Inc.*, 371 F.Supp. 900 (W.D.Ark.1974). A copyright in a directory, however, is properly viewed as resting on the originality of the selection and arrangement of the factual material, rather than on the industriousness of the efforts to develop the information. *See Nimmer, supra*, at § 3.04. Copyright protection does not extend to the facts themselves, and the mere use of the information contained in a

---

2. The statutory law applicable to this infringement action is the Copyright Act of 1909, 17 U.S.C. § 1 *et seq.* (1970). Although Congress revised and recodified the law in the Copyright Act of 1976, 17 U.S.C.A. § 101 *et seq.*, the legislative history indicates the revision was not intended to change the scope of copyright protection under the previous law: "Its purpose is to restate, in the context of the new single Federal system of copyright, that basic dichotomy between expression and idea remains unchanged." House Report on the Copyright Act of 1976, H.R.Rep. 94–1476, 94th Cong., 2d Sess. 52, *reprinted in* [1976] U.S.Code Cong. & Ad.News 5659, 5670.

3. *Huie v. National Broadcasting Co.*, 184 F.Supp. 198 (S.D.N.Y.1960). In light of the Second Circuit's decisions in *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980), and *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303 (2d Cir. 1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967), the decision in *Huie* can no longer be considered good law in that circuit, absent wholesale appropriation of expression.

directory without a substantial copying of the format does not constitute infringement. *See, e. g., New York Times Co. v. Roxbury Interface, Inc.*, 434 F.Supp. 217 (D.N.J.1977) (reference to a copyrighted index to produce a substantially different type of index is fair use); *Triangle Publications, Inc. v. Sports Eye, Inc.*, 415 F.Supp. 682 (E.D.Pa.1976) (holding that data compiled and published by plaintiff in the "Past Performances" section of the *Daily Racing Form* could be used by defendant to make the comparisons and judgments found in its competing publication *Fast Performances* without infringing plaintiff's copyright because only the method or form of expressing the data, and not the data itself, is copyrightable).

 In any event, it may be better to recognize the directory cases as being in a category by themselves rather than to attempt to bring their result and rationale to bear on nondirectory cases. Under the 1909 Copyright Act, directories are specifically identified as copyrightable subject matter, 17 U.S.C. § 5(a) (1970),[4] and the rule is now well settled that they can be copyrighted, *see Nimmer, supra*, at § 2.04[B]. However appropriate it may be to extend copyright protection to the selection and arrangement of factual material in a directory if it involves originality and hence authorship, and however difficult it may be to reconcile these cases with the principle that facts are not copyrightable, *see Nimmer, supra*, at § 3.04, the special protection granted directories under the copyright law has generally not been applied to other factual endeavors. For example, the labor involved in news gathering and distribution is not protected by copyright although it may be protected under a misappropriation theory of unfair competition. *International News Service v. The Associated Press*, 248 U.S. 215, 39 S.Ct. 68, 63 L.Ed. 211 (1918). In the *International*

*al News* case, the Supreme Court commented in dicta that while a newspaper story, as a literary production, can by copyrighted,

> the news element—the information respecting current events contained in the literary production—is not the creation of the writer, but is a report of matters that ordinarily are *publici juris*; it is the history of the day. It is not to be supposed that the framers of the Constitution ... intended to confer upon one who might happen to be the first to report a historic event the exclusive right for any period to spread the knowledge of it.

*Id.* at 234, 39 S.Ct. at 71.

Apart from the directory cases, the only decision cited to this Court which lends support for the challenged instruction is *Toksvig v. Bruce Publishing Co.*, 181 F.2d 664 (7th Cir. 1950). In *Toksvig*, plaintiff had written a biography of Hans Christian Anderson after extensive research of primary Danish sources. Defendant, who could not read Danish, copied twenty-four specific passages from plaintiff's book in writing her own biography. The Seventh Circuit held the copying of these passages, original translations from Danish separately copyrightable under 17 U.S.C. § 6 (1970), constituted copyright infringement. The court went on to reject defendant's fair use defense, primarily because defendant's use of the translations from Danish had allowed her to write her biography in one-third the time it took plaintiff. The court said the question was not whether defendant could have obtained the same information by going to the sources plaintiff had used, but whether she in fact had done her own independent research. *Id.* at 667.

Although most circuits apparently have not addressed the question, the idea that historical research is copyrightable was ex-

---

4. Under the Copyright Act of 1976, directories fall into the category of "compilations," copyrightable under 17 U.S.C.A. § 103. A compilation is defined as "a work formed by the collection and assembling of preexisting materials or of data that are selected, coordinated, or arranged in such a way that the resulting work as a whole constitutes an original work of authorship." 17 U.S.C.A. § 101.

pressly rejected by the Second Circuit in the more soundly reasoned case of *Rosemont Enterprises, Inc. v. Random House, Inc.*, 366 F.2d 303 (2d Cir. 1966), *cert. denied*, 385 U.S. 1009, 87 S.Ct. 714, 17 L.Ed.2d 546 (1967). In *Rosemont*, it was alleged that defendant's biography of Howard Hughes infringed the copyright on a series of *Look* articles about Hughes. The district court had asserted in sweeping language that an author is not entitled to utilize the fruits of another's labor in lieu of independent research, relying on *Toksvig*. The Second Circuit reversed. While not challenging the holding of *Toksvig* that substantial copying of specific passages amounted to copyright infringement, it rejected the language regarding independent research:

> We ... cannot subscribe to the view that an author is absolutely precluded from saving time and effort by referring to and relying upon prior published material.... It is just such wasted effort that the proscription against the copyright of ideas and facts, and to a lesser extent the privilege of fair use, are designed to prevent.

366 F.2d at 310 (citations omitted).

The Second Circuit has adhered to its position in the most recent appellate case to address the question, *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972 (2d Cir.), *cert. denied*, —— U.S. ——, 101 S.Ct. 121, 66 L.Ed.2d 49 (1980). *Hoehling* involved various literary accounts of the last voyage and mysterious destruction of the German dirigible Hindenberg. Plaintiff A. A. Hoehling published a book in 1962 entitled, *Who Destroyed the Hindenberg?* Written as a factual account in an objective, reportorial style, the premise of his extensively researched book was that the Hindenberg had been deliberately sabotaged by a member of its crew to embarrass the Nazi regime. Ten years later, defendant Michael McDonald Mooney published his book, *The Hindenberg*. While a more literary than historical account, it also hypothesized sabotage. Universal City Studios purchased the

movie rights to Mooney's book and produced a movie under the same title, although the movie differed somewhat from the book. During the litigation, Mooney acknowledged he had consulted Hoehling's book and relied on it for some details in writing his own, but he maintained he first discovered the sabotage theory in Dale Titler's *Wings of Mystery*, also released in 1962.

Hoehling sued Mooney and Universal for copyright infringement. The district court granted defendants' motion for summary judgment and the Second Circuit affirmed, holding that, assuming both copying and substantial similarity, all the similarities pertained to categories of noncopyrightable material. The court noted the sabotage hypothesis espoused in Hoehling's book was based entirely on interpretation of historical fact and was not copyrightable. 618 F.2d at 979. The same reasoning applied to Hoehling's claim that a number of specific facts, ascertained through his personal research, were copied by defendants. Relying on the *Rosemont* case, the court stated that factual information is in the public domain and "each [defendant] had the right to 'avail himself of the facts contained' in Hoehling's book and to 'use such information, whether correct or incorrect, in his own literary work.' " 618 F.2d at 979 (quoting *Greenbie v. Noble*, 151 F.Supp. 45, 67 (S.D.N.Y.1957)). *See also Suid v. Newsweek Magazine*, 503 F.Supp. 146 (D.D.C. 1980).

We find the approach taken by the Second Circuit in *Hoehling* and *Rosemont* to be more consistent with the purpose and intended scope of protection under the copyright law than that implied by *Toksvig*. The line drawn between uncopyrightable facts and copyrightable expression of facts serves an important purpose in copyright law. It provides a means of balancing the public's interest in stimulating creative activity, as embodied in the Copyright Clause, against the public's need for unrestrained access to information. It allows a subse-

quent author to build upon and add to prior accomplishments without unnecessary duplication of effort. As expressed by the Second Circuit in *Hoehling*:

> The copyright provides a financial incentive to those who would add to the corpus of existing knowledge by creating original works. Nevertheless, the protection afforded the copyright holder has never extended to history, be it documented fact or explanatory hypothesis. The rationale for this doctrine is that the cause of knowledge is best served when history is the common property of all, and each generation remains free to draw upon the discoveries and insights of the past. Accordingly, the scope of copyright in historical accounts is narrow indeed, embracing no more than the author's original expression of particular facts and theories already in the public domain.

618 F.2d at 974.

The valuable distinction in copyright law between facts and the expression of facts cannot be maintained if research is held to be copyrightable. There is no rational basis for distinguishing between facts and the research involved in obtaining facts. To hold that research is copyrightable is no more or no less than to hold that the facts discovered as a result of research are entitled to copyright protection. Plaintiff argues that extending copyright protection to research would not upset the balance because it would not give the researcher/author a monopoly over the facts but would only ensure that later writers obtain the facts independently or follow the guidelines of fair use if the facts are no longer discoverable. But this is precisely the scope of protection given any copyrighted matter, and the law is clear that facts are not entitled to such protection. We conclude that the district court erred in instructing the jury that research is copyrightable.

■ Our inquiry does not end here, however. In reviewing a trial court's instructions to the jury an appellate court must consider the charge as a whole from the standpoint of the jury, in view of the allegations made, the evidence presented and the arguments of counsel. If the charge as a whole correctly instructs the jury, no reversible error may be committed even though a portion of the charge may be technically imperfect. *Shelak v. White Motor Co.*, 581 F.2d 1155, 1161 (5th Cir. 1978); *Coughlin v. Capitol Cement Co.*, 571 F.2d 290, 300 (5th Cir. 1978).

■ In this case the erroneous statement of law was one sentence in a charge of twelve pages correctly stating the distinction between facts and expression and that facts are not copyrightable. The idea that research is copyrightable was nevertheless impressed upon the jury throughout the liability phase of the trial. In opening argument, counsel for plaintiff stressed the amount of labor and research done by Miller in writing the book. Over defendants' objection, Miller was permitted to testify extensively regarding the amount of time spent researching the book. Although relevant to damages, such testimony was clearly irrelevant to the question of whether defendants' work had infringed plaintiff's book. In closing argument, plaintiff's counsel again stressed that everything Miller did in his research for eighteen to twenty months and put in his book was copyrightable. The fact that counsel considered the faulty instruction to be "the heart" and "the guts of the case," as he told the trial court, is further indication that the "research is copyrightable" theory permeated the entire liability phase of the trial.

Viewing the record as a whole, the Court is left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations. *See McCullough v. Beech Aircraft Corp.*, 587 F.2d 754 (5th Cir. 1979). Because there is uncertainty as to whether the jury was actually misled, the erroneous instruction cannot be ruled harmless and a new trial is required.

*Exclusion of Defendants' Expert Witness*

■ Before trial the district court entered a general sequestration order applica-

ble to all witnesses, pursuant to Fed.R.Evid. 615. Although sequestered, defendants' literary expert witness, Professor Sullivan, received transcribed portions (known as daily copy) of Gene Miller's trial testimony. When discovered on the ninth day of trial, the court found this to be a clear and intentional violation of the sequestration order and refused to allow Professor Sullivan to testify.

On appeal defendants challenge both the finding of a violation of the rule and the exclusion of their expert witness as a sanction for the violation. Since the sanction applied here would be reasonable for a violation of rule .615, we address only whether the district court correctly held that a violation occurred.

Rule 615 provides:

At the request of a party the court shall order witnesses excluded so that they cannot hear the testimony of other witnesses, and it may make the order of its own motion. This rule does not authorize exclusion of (1) a party who is a natural person, or (2) an officer or employee of a party which is a natural person designed as its representative by its attorney, or (3) a person whose presence is shown by a party to be essential to the presentation of his cause.

Defendants, contending it was not a violation of the rule to allow Professor Sullivan to read daily copy in preparation for his court appearance, argue (1) the reading of daily copy is not a violation because rule 615 literally prohibits witnesses only from *hearing* the testimony of other witnesses; (2) expert witnesses are impliedly exempt from sequestration under the rule; and (3) Professor Sullivan was expressly exempt from sequestration under subsection (3) of the rule because he was necessary for the management of the case.

The purpose of the sequestration rule is to prevent the shaping of testimony by one witness to match that of another, and to discourage fabrication and collusion. *Taylor v. United States*, 388 F.2d 786 (9th Cir. 1967); *United States v. Leggett*, 326 F.2d 613 (4th Cir.), *cert. denied*, 377 U.S. 955, 84 S.Ct. 1633, 12 L.Ed.2d 499 (1964). The opportunity to shape testimony is as great with a witness who reads trial testimony as with one who hears the testimony in open court. The harm may be even more pronounced with a witness who reads trial transcript than with one who hears the testimony in open court, because the former need not rely on his memory of the testimony but can thoroughly review and study the transcript in formulating his own testimony. The court properly held that providing a witness daily copy constitutes a violation of rule 615.

Defense counsel's statement during oral argument that it is a common practice in the Miami area to allow witnesses to read daily copy despite the existence of a sequestration order gives us some cause for concern. There is nothing in the record to substantiate counsel's statement, however, and we cannot speculate that most attorneys in Miami either do not realize that reading daily copy violates the sequestration rule or have adopted a practice that violates the rule. The district judge commented at trial that in the five years he had been on the bench he had never heard of allowing witnesses to read daily copy.

Defendants argue that rule 615 must be read to impliedly exclude from sequestration expert witnesses, who usually do not testify regarding the facts of the case but only express their opinion based on those facts, in order to prevent the rule from conflicting with rule 703,[5] which permits an expert to base his opinion on facts or data

---

5. Fed.R.Evid. 703 provides:

The facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to him at or before the hearing. If of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.

perceived by him at trial. Defendants rely primarily on *Morvant v. Construction Aggregates Corp.*, 570 F.2d 626 (6th Cir. 1978), *cert. dismissed*, 439 U.S. 801, 99 S.Ct. 44, 58 L.Ed.2d 94 (1979), in which the court stated it could "perceive little, if any, reason for sequestering a witness who is to testify in an expert capacity only and not to the facts of the case." *Id.* at 629. The *Morvant* court further held, however, that rule 703 does not furnish an automatic basis for exempting an expert from sequestration under rule 615. *Id.* at 630. We agree. Whether or not it would be reasonable for a trial court to exempt an expert witness from a sequestration order, there is no required exemption implied under rule 615. Exemption would be questionable in a case such as this, however, where defendants' expert was to testify about the two works upon which Gene Miller was giving his own similarity analysis.

With respect to the contention the witness was exempt under the express exception provided in subsection (3) of the rule for persons who are essential to the presentation of a party's case, defendants never sought an exemption for Professor Sullivan either before trial or after the violation became known. They only argued that Professor Sullivan's testimony was crucial to their case. It also appears that defendants' literary expert is probably not the type of expert intended to be exempt under this exception. The Notes of the Advisory Committee on the Proposed Rules suggest the third category of exempt witnesses contemplates such person as either an agent who handled the transaction being litigated or an expert needed to advise counsel in the management of the litigation. We need not decide the issue, however, because defendants failed to argue this exception to the trial court and cannot now raise it on appeal. *See Morvant*, 570 F.2d at 628 (rejecting an identical argument for failure to present it to the district court).

### Testimony and Cross-Examination of Plaintiff

■ Over defendants' objection, the trial judge allowed plaintiff to testify as a lay witness regarding similarities between his book and defendants' movie. The court refused to allow defendants to cross-examine plaintiff and his expert witness regarding similarities between books they had authored and earlier books by other authors on the same subject. We perceive no error in either ruling.

■ The admission of evidence is committed to the sound discretion of the trial court. *United States v. Ashley*, 555 F.2d 462 (5th Cir.), *cert. denied*, 434 U.S. 869, 98 S.Ct. 210, 54 L.Ed.2d 147 (1977); *United States v. Hearod*, 499 F.2d 1003 (5th Cir. 1974). Fed.R.Evid. 701 is designed specifically to allow lay witnesses to testify in a conclusory fashion under certain circumstances. The rule states:

> If the witness is not testifying as an expert, his testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of his testimony or the determination of a fact in issue.

The plaintiff author in this case was in a unique position of being intimately familiar with the allegedly infringed work. We see no abuse of discretion in allowing him to testify on the similarities between the book he had written and defendants' movie.

The district court also did not abuse its discretion in limiting the scope of defendants' cross-examination of plaintiff and his expert witness. The thrust of the attempted cross-examination was to show that plaintiff and his expert had both copied from previous works in their own writings. Defendants argued to the trial court the cross-examination was relevant to illustrate that the use of earlier depictions of historical facts was an accepted literary practice and to cast doubt on the credibility of the witnesses' testimony on what constitutes unlawful copying. In refusing to allow defendants to pose this line of questioning, the court found it irrelevant to the central

issue in the trial: whether defendants' movie infringed plaintiff's copyright. The district court has wide discretion on matters of relevancy and materiality of evidence, *United States v. Grimm*, 568 F.2d 1136 (5th Cir. 1978), and we do not find the determination of irrelevancy to be reversible error. Even if the evidence was in some way relevant to the issues at trial, its probative value was substantially outweighed by the danger of unfair prejudice and confusion of the issues, and therefore could be properly excluded under Fed.R.Evid. 403. The ruling did not prevent defendants from establishing their fair use defense.

### Introduction of Preliminary and Shooting Scripts

 To prevail on a claim of copyright infringement, a plaintiff must prove ownership of the copyright and copying by the alleged infringer. *Ferguson v. National Broadcasting Co.*, 584 F.2d 111, 113 (5th Cir. 1978); M. Nimmer, 3 *Nimmer on Copyright* § 13.01 (1980). Since there is often no direct evidence of copying, it is ordinarily established by proving access to the copyrighted material and substantial similarity between the two works. *Nimmer, supra*, at § 13.01[B]. A defendant can rebut such a showing by offering evidence that his work was independently created without reference to the prior work, since a copyright, unlike a patent, does not confer an absolute monopoly over the expression but only a right of control over the works which are derived from the copyrighted work. *Fred Fisher, Inc. v. Dillingham*, 298 F. 145 (S.D. N.Y.1924); M. Nimmer, 2 *Nimmer on Copyright* § 8.01. If defendant offers evidence of independent creation, the plaintiff has the burden of proving that the defendant in fact copied the protected material.

 Plaintiff in this case sought to prove copying by establishing access, substantial similarity, and lack of independent creation. In doing so, he was permitted to introduce into evidence several preliminary scripts and the script used in filming the movie.

It was not error for the court to allow plaintiff to introduce the various scripts used in developing the movie. Because of the different media involved, examination of the various scripts was relevant to plaintiff's showing of the process by which the book was transformed into the movie. Moreover, defendants offered testimony that its movie was created independently from plaintiff's book. To negate the inference of independent creation, plaintiff offered the scripts into evidence to show the manner and speed in which the movie was produced. Thus, the various scripts were relevant and admissible on the issue of independent creation, even though the ultimate test of infringement was the film as broadcast. *See Cain v. Universal Pictures Co.*, 47 F.Supp. 1013 (S.D.Cal.1942); *De-Montijo v. 20th Century Fox Film Corp.*, 40 F.Supp. 133 (S.D.Cal.1941).

In any event, it is doubtful defendants were prejudiced by admission of the early scripts. They had an opportunity to point out any changes that were made between these scripts and the movie, and the jury was properly instructed that the question before them was whether the movie as broadcast was substantially similar to the book. *See Huie v. National Broadcasting Co.*, 184 F.Supp. 198 (S.D.N.Y.1960).

### Cumulative Recovery of Damages and Profits

 In accordance with the jury verdict, plaintiff was awarded $185,000 in damages and $31,750 in profits earned by defendants as a result of their unlawful infringement. Defendants assert the award of both damages and profits was improper.

The Copyright Act of 1909, which governed the trial of this case, provides that an infringer is liable for "such damages as the copyright proprietor may have suffered due to the infringement, as well as all the profits which the infringer shall have made

from such infringement." 17 U.S.C. § 101(b) (1970). Although the statutory language of section 101(b) explicitly provides for a cumulative recovery, confusion was engendered by language in the legislative history of the 1909 Act which indicated the legislators may have intended only an alternative recovery. H.R.Rep.No.2222, 60th Cong., 2d Sess. 15 (1909). In the face of these contradictory signals, courts have divided on the issue. *Compare Sid & Marty Krofft Television Productions, Inc. v. McDonald's Corp.*, 562 F.2d 1157 (9th Cir. 1977); *Universal Pictures Co. v. Harold Lloyd Corp.*, 162 F.2d 354 (9th Cir. 1947), *with Thomas Wilson & Co. v. Irving J. Dorfman Co.*, 433 F.2d 409 (2d Cir. 1970), *cert. denied*, 401 U.S. 977, 91 S.Ct. 1200, 28 L.Ed.2d 326 (1971); *Peter Pan Fabrics, Inc. v. Jubela Fabrics, Inc.*, 329 F.2d 194 (2d Cir. 1964); *Baldwin Cooke Co. v. Keith Clark, Inc.*, 420 F.Supp. 404 (N.D.Ill.1976). The 1976 revision of the Copyright Act resolved the conflict in favor of cumulative recovery. *See* 17 U.S.C.A. § 504(b).

The question is, one of first impression in this Circuit. This Court generally adheres to the literal statutory language and has rejected "attempts to use legislative history to *override* the unambiguous language of the statute." *Brennan v. Taft Broadcasting Co.*, 500 F.2d 212, 217 (5th Cir. 1974) (emphasis in original). *See also United States v. Second National Bank of North Miami*, 502 F.2d 535, 539–40 (5th Cir. 1974), *cert. denied*, 421 U.S. 912, 95 S.Ct. 1567, 43 L.Ed.2d 777 (1975). The language of section 101(b) unambiguously provides for the recovery of both actual damages and profits. This reading is consistent with the purpose of copyright law to discourage wrongful infringement as well as to compensate the copyright owner. *See F. W. Woolworth Co. v. Contemporary Arts, Inc.*, 344 U.S. 228, 233, 73 S.Ct. 222, 225, 97 L.Ed. 276 (1952); H.R.Rep.No.94–1476, 94th Cong., 2d Sess. 161, *reprinted in* [1976] U.S. Code Cong. & Ad.News 5659, 5777. We therefore hold a plaintiff may recover both damages sustained by him and profits earned by the infringers as a result of unlawful infringement.

### Conclusion

Additional issues raised by defendants on appeal, including the correctness of the special verdict form, the propriety of certain comments made by plaintiff's counsel during closing arguments, and the reasonableness of the attorney's fee award to plaintiff, need not be decided in light of the remand for a new trial.

REVERSED AND REMANDED.