[DO NOT PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 19-14894
Non-Argument Calendar
_____

D.C. Docket No. 1:18-cv-23462-RS


VIRGINIA VALLEJO,

Plaintiff - Appellant,

versus

NARCOS PRODUCTIONS LLC,
a Delaware limited liability company,
NETFLIX, INC.,
a Delaware corporation,
GAUMONT TELEVISION USA LLC,
a Delaware limited liability company
f.k.a. Gaumont International Television LLC,
DYNAMO PRODUCCIONES S.A.,

Defendants - Appellees.

_____

Appeal from the United States District Court
for the Southern District of Florida

_____

(October 27, 2020)

Before JORDAN, GRANT, and LUCK, Circuit Judges.

PER CURIAM:

In this copyright infringement case, Virginia Vallejo appeals the district court's grant of summary judgment in favor of Narcos Production LLC, Netflix, Inc., and Gaumont Television USA LLC. She contends that the district court erred when it concluded that two scenes from the television series *Narcos*, in episodes 103 and 104, were not substantially similar to two chapters in her memoir, *Amando a Pablo, Odiando a Escobar* (2013). Following review of the record and parties' briefs, we affirm.

**I**

From mid-1983 until September of 1987, Ms. Vallejo, a well-known Colombian journalist and anchorwoman, had a romantic affair with Pablo Escobar, a notorious Colombian drug trafficker. Based on this affair, she authored the memoir *Amando a Pablo, Odiando a Escobar* (2013), which translates to *Loving Pablo, Hating Escobar*. She owns the copyright in two Spanish-language versions of the book, Copyright Registration TX0007105765 and Copyright Registration TX0007833787.

The memoir recounts Ms. Vallejo's romantic relationship with Mr. Escobar, as well as the rise of the Colombian drug cartels. According to Ms. Vallejo, the facts in the memoir are "all true."

2

**A**

Two chapters in Ms. Vallejo's memoir are at issue on this appeal—"The Caress of a Revolver" and "That Palace in Flames." "The Caress of a Revolver" describes a romantic encounter between Ms. Vallejo and Mr. Escobar, in which Mr. Escobar uses a gun in foreplay with Ms. Vallejo. "That Palace in Flames" chronicles a meeting between Mr. Escobar, Ms. Vallejo, and Ivan Marino Ospina, one of the heads of M-19, a Colombian guerrilla organization.

**1**

In "The Caress of a Revolver," Mr. Escobar takes Ms. Vallejo to his penthouse by telling her that there is a surprise waiting for her. *See* D.E. 76-1 at 13. At the penthouse, Ms. Vallejo sits in a low-backed chair and Mr. Escobar speaks to her in a "threatening tone and [with] an ice-cold expression in his eyes." *Id*. He then says to her:

> So now you see who has the higher IQ here. Not to mention who's got the balls, right? And if you complain or make one false move while I'm preparing the surprise, I'm going to rip that dress in two, film what comes next, and sell the video to the media.

*Id*.

Mr. Escobar then ties a black blindfold over Ms. Vallejo's eyes, while humming "Feelin' Groovy" by Simon and Garfunkel, and wonders where he placed his handcuffs. *See id*. Ms. Vallejo refuses to be handcuffed and gagged, and Mr.

3

Escobar relents by telling her that he would "never underestimate a panther with delusions of genius." *Id*. She answers: ". . . I would never underestimate a criminal with the delusions of a schizophrenic." *Id*. She then hears Mr. Escobar open a safe and load six bullets into a revolver. *See id*. He stands behind her, "speaking into [her] ear in a whispery voice while his left hand holds [her] by the hair and the other slides the barrel of the gun in circles on [her] neck, around and around." *Id*.

Soon thereafter, Mr. Escobar asks Ms. Vallejo if it is terrifying to have a gun pointed at her by a murderer. *See id*. at 14. She answers by saying:

> Quite the opposite: it's absolutely exquisite! Ooohhh . . . what could be more divine . . . . more sublime, I say, throwing my head back and sighing in pleasure while he unbuttons my shirt dress and the gun starts to descend along my throat toward my heart. "And, in any case, you're only a sadist . . . not a murderer."

*Id*. He prompts her to describe why she likes it so much and starts to kiss her neck and shoulders. *See id*. Ms. Vallejo describes the gun and the sensations as "the revolver descends slowly in a straight line down my breast and my diaphragm, across my waist and toward my abdomen." *Id*. She then abruptly tells him, "I swear to you Pablo, if you go one millimeter lower I'll get up from this chair, go back to Bogota, and you'll never see me again!" *Id*. Mr. Escobar stops "with a guilty little laugh of resignation." *Id*.

A few seconds later, Mr. Escobar tells Ms. Vallejo to remove the blindfold for her surprise, and she sees more than a dozen fake passports on the floor in front of

4

her, all belonging to him. *See id.* at 15. When she tries to get a closer look, he puts handcuffs around her ankle and attaches them to the chair. *See id.* After looking at the passports for some time, Mr. Escobar puts them back in the safe, lays the revolver on a desk, removes the handcuffs, and carries Ms. Vallejo to the bed. *See id.* at 16.

## 2

In "That Palace in Flames," Ms. Vallejo writes about a meeting she had with Mr. Escobar and a man named Ivan Marino Ospina. *See id.* at 22. The meeting takes place in Mr. Escobar's estate near Medellin. *See id.* at 21. Mr. Escobar tells Ms. Vallejo that he is going to introduce her to Mr. Ospina, who is a top leader of the M-19 guerrilla group. *See id.* Mr. Escobar describes Mr. Ospina as "the toughest of all comandantes" and tells her that Mr. Ospina is not afraid of him. *See id.* He further warns her that Mr. Ospina is "very high" in the M-19 command hierarchy. *See id.* at 22. Ms. Vallejo then proceeds to describe Mr. Ospina's appearance:

> I imagine that the Amazonian commander will look like an army sergeant and wear camouflage, that he'll see me as an intruder in a meeting of very macho men, and that he'll do everything humanly possible to get rid of me so that Pablo will stay and talk about money. Ivan Marino Ospina is a man of medium build, blunt features, wispy hair, and a mustache, and beside him Escobar looks like Adonis. . . . I realize immediately that the legendary guerilla chief really isn't afraid of Pablo or of anyone else, because from the moment he lays eyes on me he doesn't take them from my face, my body, my legs; he has an inflamed gaze that to this day I don't remember ever seeing in another man. The M-19 leader is wearing civilian clothes. . . .

*Id.* After chatting for a few minutes, Ms. Vallejo leaves the room. *See id.* at 23. When she returns, she pauses outside the door listening to the conversation between Mr. Escobar and Mr. Ospina. *See id.* She overhears Mr. Ospina saying that Mr. Escobar owes him a million dollars. *See id.*

Ms. Vallejo reenters the room, and after a minute or two asks Mr. Ospina why he joined the revolutionary fight. *See id.* at 24. He replies by telling her about atrocities committed by conservative hit squads, called birds, against his family. *See id.* Ms. Vallejo speaks to Mr. Ospina about her own family's experience with the birds. *See id.* She tells Mr. Ospina that she quit "the highest-paid job on television for refusing . . . to refer to your group as a 'band of criminals.'" *Id.* at 25. Mr. Ospina seems surprised, and Mr. Escobar interrupts to add that Ms. Vallejo had already been fired from another job for supporting the creation of a technicians' union. *See id.*

After Mr. Ospina leaves, Ms. Vallejo asks Mr. Escobar what the million dollars is for. *See id.* He answers, "[t]o recover my files and set them on fire. And without a record, there's no way they can extradite me." *Id.* He explains that in a few weeks the Colombia Constitutional Court will begin to consider his case for extradition to the United States, and says that there are six thousand files of evidence against him at the Palace of Justice. *See id.* 25–26.

6

Ten days later, Mr. Ospina is killed in a confrontation with the army. *See id.* at 27. Nearly three months later, an armed M-19 rebel group seizes the Palace of Justice. *See id.* at 29. During the siege, the M-19 rebel group makes various political demands. *See id.* A fire breaks out, destroying thousands of documents. *See id.* at 29–30.

Months later, Ms. Vallejo learns from Mr. Escobar that he paid Mr. Ospina one million dollars and promised another one million dollars in arms and financial aid down the line for the attack on the Palace of Justice. *See id.* at 38. He adds that the weapons and munitions did not make it on time because the plan had to be moved up when the Constitutional Court was going to start to study the extradition case, "and the evidence against us was overwhelming." *Id.* at 38–39.

**B**

In October of 2012, Narcos Productions started producing the television series *Narcos*, which tells the story about the Colombian drug trade. Gaumont Television USA distributed the series throughout international markets. Netflix made the series available for public viewing on its internet-based streaming video service, and licensed the first season of *Narcos* to be broadcast on Univision.

In her complaint, Ms. Vallejo claims that two scenes from *Narcos* infringe on her copyright. First, she asserts that a scene from season one, episode 103, of *Narcos* is similar to "The Caress of a Revolver" because it is a sex scene between Mr.

7

Escobar and a character named Valeria Velez (who is supposed to be Ms. Vallejo) involving a gun. Second, she contends that a scene from season one, episode 104, of *Narcos*—portraying a meeting between Mr. Escobar and a character named "Ivan" who is a leader in M-19—is similar to "That Palace in Flames."

**1**

In season one, episode 103, of *Narcos*, the scene at issue opens with Ms. Velez in a luxurious bedroom. She is already tied to the bed by her wrists and is blindfolded. She is wearing a bra, panties, a garter belt, and stockings. The actor playing Mr. Escobar's character is holding a newspaper that refers to him as "un Robin Hood Paisa." He approaches the bed while holding a gun and tells Ms. Velez that his name is everywhere—in newspapers, magazines. When he gets to the side of the bed, he throws the gun on the bed and straddles Ms. Velez.

Mr. Escobar tells her that she is going to have to pay for exposing him to so much publicity, as he pulls off the blindfold from her eyes and leaves his arm resting on her shoulder with his hand in her hair. She replies that she will pay anything he wants. Mr. Escobar starts caressing Ms. Velez with the gun and, while doing so, tells her that she is going to help get him elected to congress. She responds "Yes, Pablo. Yes," while he continues to caress her with the gun. D.E. 79-7.

Though not explicitly shown, the implication is that Mr. Escobar is using the gun to either penetrate Ms. Velez or touch her genitalia. Next, Ms. Velez can be

8

seen climaxing.  The scene ends with them sharing a kiss and laying down on the bed with Mr. Escobar on top of Ms. Velez.

**2**

In season one, episode 104, of *Narcos*, Mr. Escobar and some of his associates are discussing the fate of another drug kingpin who was extradited to the United States.  One of them says that a motion has been filed before the Colombian Supreme Court challenging the legality of extradition, which is going to be considered this week.  Another associate says, "[w]e're next, aren't we?"  D.E. 81.  Mr. Escobar says that a jail in the United States is worse than death and adds: "But remember, they want someone more than they want us.  So, brothers, it's time to give them what they want, isn't it?"  *Id*.

The meeting scene in *Narcos* opens with Mr. Escobar sitting in a room with a man named Ivan.  Mr. Escobar is trying to strike a deal with Ivan, who seems relatively young, has a beard, mustache, and is dressed in civilian clothes.  Ivan is leaning back on the couch while Mr. Escobar is leaning forward on the edge of a chair.  There are several armed men in the room.

Ivan tells Mr. Escobar that he did not think their paths would cross again.  He continues by implying that the attack on the Palace of Justice would not be that simple; it would require more men and weapons, and there would be casualties.  Ivan then inquires about how much money is involved.  Mr. Escobar answers two million

dollars. Ivan states that it is too dangerous and Mr. Escobar counters that "fighting a revolution comes with sacrifice." *Id*.

The camera then cuts to a woman, not Ms. Velez, wearing scrubs, who gets out of a taxi in front of a house and walks through the house's outside gate. The scene cuts away from the woman and back inside to the meeting between Mr. Escobar and Ivan. A knock is heard. One of the armed men answers the door while Mr. Escobar presses Ivan by telling him that "it is our duty to fight to the very end. We have a[ ] historical obligation. We can't ignore it." *Id*. The woman in scrubs is then escorted into the room and Ivan says "[m]eet Pablo Escobar." *Id*. Mr. Escobar stands, and the men agree that they have a deal. Mr. Escobar and his men leave.

The woman in scrubs—Ivan's comrade in arms, viewers are led to assume—asks Ivan, "[w]hat the hell is this?" *Id*. He tells her that he and Mr. Escobar have reached an agreement involving an exchange of money that is "necessary for the revolutionary fight." *Id*. He does not explain to her what the agreement entails, and she tells him, "I fight for the people, not for the drug traffickers." *Id*.

In the next scene, the woman in scrubs approaches one of her co-workers and asks to speak to the co-worker's husband, who works at the United States Embassy. She tells her co-worker that "Pablo Escobar is planning something with the communist group called M-19. I don't know what it is, but I know it is going to be bad." *Id*. The co-worker can be seen calling her husband, but by the time she tells

10

him, news of the raid on the Palace of Justice is breaking on television.   The

voiceover of the series' narrator then takes over:

> Financed by Escobar, the M-19 guerillas stormed the Palace of Justice and occupied the Supreme Court. They took over a hundred hostages and made a bunch of demands about the redistribution of wealth, and an end to injustice and tyranny, but it was all bullshit. The military attacked, dozens of lives were lost in the carnage, including half the Colombian Supreme Court justices. Most of the M-19 were killed, some escaped, but not before accomplishing their true goal: setting fire to the room that contained six hundred thousand pages of evidence against Escobar. The entire case against him turned to ash. In the United States, the mafia makes witnesses disappear so they can't testify in court. In Colombia, Pablo Escobar made the whole court disappear.

*Id*.  During the narration, a fictional film of the raid and military response is played.

Five men, including Ivan, are shown breaking into a file room in the Palace of

Justice, splashing gasoline on the files, and lighting them on fire.

## II

Based on these scenes from episodes 103 and 104 of *Narcos*, Ms. Vallejo

brought a copyright infringement claim against the defendants.  After reviewing both

the memoir and the *Narcos* scenes at issue, the district court granted summary

judgment in favor of the defendants.  Ms. Vallejo now appeals.

We review *de novo* the district court's grant of summary judgment, viewing

the evidence in the light most favorable to the party opposing the motion.  *See Leigh*

11

*v. Warner Bros., Inc.*, 212 F.3d 1210, 1214 (11th Cir. 2000).  "Summary judgment is only proper when there are no genuine issues of material fact" and the moving party is entitled to judgment as a matter of law.  *Id.*

Ms. Vallejo argues that "summary judgment is often inappropriate in copyright infringement cases due to their inherent subjectivity."  Appellant's Br. at 25.  *See also Beal v. Paramount Pictures Corp.*, 20 F.3d 454, 459 (11th Cir. 1994) (stating that "[s]ome courts have observed that summary judgment is peculiarly inappropriate in copyright infringement cases due to their inherent subjectivity") (citing *Hoehling v. Universal City Studios, Inc.*, 618 F.2d 972, 977 (2d Cir. 1980)).  We, however, have affirmed the grant of "summary judgment in infringement cases when it is clear that the moving party is entitled to judgment as a matter of law."  *Id.*

### III

To succeed on a copyright infringement claim, the plaintiff must prove "(1) ownership of a valid copyright, and (2) copying of constituent elements of the work that are original."  *Feist Publ'n, Inc., v. Rural Tel. Serv. Co.*, 499 U.S. 340, 361 (1991).  In their motion for summary judgment, the defendants conceded that Ms. Vallejo holds a valid copyright in her memoir *Amando a Pablo, Odiando a Escobar* (2013).  Thus, only the copying element is contested.

The copying element is satisfied if (1) "the defendant, as a factual matter, copied portions of the plaintiff's" work, and (2) "as a mixed issue of fact and law,

12

those elements of the [work] that have been copied are protected expression and of such importance to the copied work that the appropriation is actionable." *MiTek Holdings, Inc. v. Arce Eng'g Co., Inc.*, 89 F.3d 1548, 1554 (11th Cir. 1996). Because the defendants admitted that they had access to and copied from Ms. Vallejo's memoir, the district court assumed that the first prong of copyright infringement was met. As a result, this "appeal centers on the subsequent inquiry of whether such copying is legally actionable; that is, whether there is substantial similarity between the allegedly offending [works] and the protectable, original elements of the" memoir. *See Peter Letterese & Assocs., Inc. v. World Inst. of Scientology Enters. Int'l*, 533 F.3d 1287, 1301 (11th Cir. 2008) (citations and internal quotation marks omitted). We may affirm the grant of "summary judgment for a defendant if the similarity between the works concerns only noncopyrightable elements, or if no reasonable jury upon proper instruction would find that the two works are substantially similar." *Beal*, 20 F.3d at 459.

## A

Before determining whether there is substantial similarity between two works, we must first separate the unprotected facts from the protected expression of those facts. *See Cable/Home Commc'n Corp. v. Network Prods., Inc.*, 902 F.2d 829, 843 (11th Cir. 1990) (citing *Harper & Row, Publishers, Inc. v. Nation Enters.*, 471 U.S.

539, 556 (1985)).  This means that we must determine what parts of Ms. Vallejo's memoir are protected under copyright law and which parts are not.[1]

We have long held that "copyright protection extends only to an author's expression of facts and not to the facts themselves." *Miller v. Universal City Studios, Inc.*, 650 F.2d 1365, 1368 (5th Cir. 1981).  An author "may not claim that the facts are original with him although there may be originality and hence authorship in the manner of reporting, *i.e.*, the expression, of the facts." *Id*. (quotations and citations omitted).  "[T]he mere use of the information contained in a [work] without a substantial copying of the format does not constitute infringement." *Id*. at 1369–70. (citations and internal quotation marks omitted).  A person who reports new facts for the first time cannot claim copyright protection in the further dissemination of those facts. *See Feist*, 499 U.S. at 353 (citing *Miller*, 650 F.2d at 1372).  With these principles in mind, we address which parts of Ms. Vallejo's memoir constitute unprotected facts and which parts constitute the protected expressions of those facts.[2]

---

[1] Ms. Vallejo argues that the district court erred in failing to articulate a legal standard requiring it to separate protectable copyright elements from unprotectable elements.  We are not convinced. The district court articulated and applied the correct legal standard.  First, it stated that the only "issue for the [c]ourt is whether there is 'substantial similarity' between the *Narcos* scenes at issue and the *protectable, original elements* of [Ms. Vallejo]'s Memoir."  D.E. 120 at 10 (emphasis added).  Second, in its analysis, the district court repeatedly separated the unprotectable facts in the memoir from the protectable expression of those facts. *See id*. at 12, 15 (separating the unprotectable facts from the protectable expression of facts).

[2] Ms. Vallejo contends that her memoir is a fictional collective work of historical research regarding Mr. Escobar and is written in the style of "magical realism."  In making this argument,

Ms. Vallejo has repeatedly admitted that the facts reported in her memoir are true. At her deposition, Ms. Vallejo testified that her foreplay with Mr. Escobar, while he was holding a gun, had taken place. She similarly acknowledged that the meeting between Mr. Ospina and Mr. Escobar, where they planned the attack on the Palace of Justice and where Mr. Escobar agreed to pay two million dollars, was also true. We therefore conclude that those facts, standing alone, do not enjoy copyright protection and could have been freely copied by the defendants in writing the *Narcos* series.

We now turn to those parts of Ms. Vallejo's memoir that do enjoy copyright protection. These are the expression of the facts contained in the publication. *See Miller*, 650 F.2d at 1368. In other words, Ms. Vallejo has copyright protection in the way that she set her "characters, theme, plot, setting, and mood and pace." *Herzog v. Castle Rock Ent.*, 193 F.3d 1241, 1258 (11th Cir. 1999). This protection includes the purported "magical realism" style in which she wrote her memoir, as well as the alleged scenes and dialogues that she recreated after 20 years from her own memory.

---

Ms. Vallejo attempts to avoid well-settled copyright precedent which provides that works that are considered non-fiction or a compilation of facts receive only thin copyright protection. *See Feist*, 499 U.S. at 349. Although it is true that fictional works based on historical research may receive more copyright protection than a pure non-fiction work or a compilation of facts, the historical facts contained within the fictional work remain unprotected. *See Miller*, 650 F.2d at 1368.

15

**B**

Having separated the unprotected facts from the expression of those facts in Ms. Vallejo's memoir, we now address whether the two *Narcos* scenes at issue here are substantially similar to the expression of facts in the two chapters of Ms. Vallejo's memoir, "The Caress of a Revolver" and "That Palace in Flames."

**1**

Ms. Vallejo argues that the district court erred in concluding that the scene in episode 103 of *Narcos* was not substantially similar to her chapter "The Caress of a Revolver." We are not persuaded.

She maintains that the defendants appropriated more than mere facts. In her view, they misappropriated her artistic expression "including, her personal choices of details, and subjective observations, such as the profiling of characters and her illustration of the interplay of the characters." Appellant's Br. at 43–44. She points to the following similarities: (1) Ms. Velez is blindfolded with a black blindfold; (2) Mr. Escobar uses a gun to caresses her neck and chest in a menacing way; (3) she appears aroused; (4) the scene takes place in an elegant room; (5) she is bound to furniture; (6) she acts in a submissive manner; (7) she does not appear to be afraid of Mr. Escobar; (8) Mr. Escobar grabs her by the hair; and (9) Mr. Escobar uses the gun in the same manner that she described in her memoir.

16

The first two alleged similarities—the blindfold and the use of the gun by Mr. Escobar—are unprotected facts, as Ms. Vallejo admitted that they indeed took place. The rest of the alleged similarities do not copy Ms. Vallejo's expression of facts in the memoir. In the memoir, Ms. Vallejo is sitting in a low-backed chair, and she is handcuffed by one of her ankles *after* Mr. Escobar stops using the gun. In the *Narcos* episode, both of Ms. Velez's arms are bound to a bedpost *before* Mr. Escobar uses the gun. Contrary to her suggestions, in her memoir Ms. Vallejo does not act in a submissive manner towards Mr. Escobar; instead, she verbally spars with him by telling him that "I would never underestimate a criminal with delusions of a schizophrenic." D.E. 76-1 at 13. She also threatens Mr. Escobar with walking out if he continues to move the gun any lower. The *Narcos* episode, on the other hand, shows Ms. Velez being completely submissive towards Mr. Escobar; she agrees to help him run for Congress and allows him to use the gun any way he wants.

Additional differences doom Ms. Vallejo's arguments that the defendants copied the details of her personal artistic choices. For example, the two scenes occur in different settings. In the memoir, Ms. Vallejo sits on a low-backed chair, but in the *Narcos* episode she is laying on a bed.

The defendants did not appropriate Ms. Vallejo's subjective observations or her characters' exchanges. In "The Caress of a Revolver," Ms. Vallejo attempts to portray "an understanding of the manipulation and power dynamics that defined

17

[her] romantic relationship with [Mr.] Escobar." Appellant's Br. at 50. Those "manipulations and power dynamic" themes are wholly absent from the *Narcos* episode, where the only person in charge is Mr. Escobar.

The mood in both scenes is also quite different, as is evident from the dialogue. In the memoir, Ms. Vallejo describes how being caressed by the gun makes her feel. Yet the dialogue in the *Narcos* episode shows Mr. Escobar trying to enlist Ms. Velez to help him run for Congress. In Ms. Vallejo's memoir, Mr. Escobar takes Ms. Vallejo to his penthouse to show her his fake passports. In the *Narcos* episode, Mr. Escobar is complaining about all the publicity he is getting and enlists Ms. Velez's help in running for Congress.

In sum, we conclude that the defendants used unprotectable facts from Ms. Vallejo's memoir and did not copy her expression of those facts because the plot, setting, mood, and the characters' interplay are not substantially similar. The district court therefore did not err when it ruled that no reasonable juror could find that "The Caress of a Revolver" and the scene from episode 103 of *Narcos* were substantially similar.

**2**

Ms. Vallejo similarly maintains that the district court erred when it found that the meeting scene in episode 104 of *Narcos* was not substantially similar to her chapter "That Palace in Flames." We disagree.

18

Ms. Vallejo points in her brief to the following similarities between her chapter and the *Narcos* scene, including, (1) one of her memoir chapters is titled "That Palace in Flames," and episode 104 in *Narcos* is titled "The Palace in Flames;" (2) Mr. Escobar and Ivan are in a hideout; (3) Ivan has a beard; (4) Ivan is wearing civilian clothing, and is of medium build with blunt features; (5) Ivan discusses the risk of casualties and the danger; (6) Mr. Escobar offers to pay two million dollars; (7) Mr. Escobar uses revolutionary overtones to persuade Ivan; and (8) Mr. Escobar is convinced that extradition is imminent.

Our comparison of "That Palace in Flames" and the meeting scene in episode 104 of *Narcos*, indicates that they are not substantially similar. Some of the alleged similarities constitute unprotectable facts, such as (1) the name of the M-19 rebel leader as Ivan or Mr. Ospina, (2) Mr. Escobar offering the two million dollars as payment, and (3) the physical description of Ivan.[3]

The *Narcos* scene, moreover, does not share or copy the protected expression found in "That Palace in Flames," as the plot, theme, dialogue, and tone are dissimilar. First, the details of the plot are different; for example, Ms. Vallejo's counterpart character in *Narcos*, Ms. Velez, is not even present in the *Narcos* scene. Instead, the *Narcos* scene introduces a new female character who did not appear in

---

[3] Furthermore, though it is true that Narcos episode 104 has an almost identical title as the chapter in Ms. Vallejo's memoir, "[w]ords and short phrases such as names, titles, and slogans" are not subject to copyright protection. *See* 37 C.F.R. § 202.1(a).

the memoir, and who tries to thwart the attack by informing someone with a connection to the United States Embassy. Some of the themes are likewise different. The memoir implies that Mr. Ospina is attracted to Ms. Vallejo by saying that he could not take his eyes from her, but that thematic element cannot be present in *Narcos* because, again, her character (Ms. Velez) is not present in the scene.

The dialogue and tone differ as well. In "That Palace in Flames," Ms. Vallejo tells Mr. Ospina that she shares similar beliefs as him by telling him that she quit her job for refusing to call the rebels a "band of criminals." D.E. 76-1 at 25. The meeting scene in *Narcos* focuses solely on the conversation between Mr. Escobar and Ivan regarding the attack on the Palace of Justice, and it is Mr. Escobar who uses revolutionary rhetoric to convince Ivan to carry out the attack.

We conclude, therefore, that the plot, theme, dialogue, and tone of "That Palace in Flames" and the *Narcos* meeting scene in episode 104 are not substantially similar. We therefore agree with the district court that no reasonable jury could find that the two works are substantially similar.

## C

Ms. Vallejo also contends that the district court failed to recognize the legal distinction between historical and non-historical facts in assessing whether the facts she reported in her memoir should be given copyright protection. Essentially, she asserts that so-called historical facts lack copyright protection because they are

20

newsworthy and that so-called non-historical facts are protected by copyright law because they are personal.  We are not persuaded by Ms. Vallejo's distinction.

First, we are skeptical of Ms. Vallejo's argument that the facts she reported regarding Mr. Escobar in the chapters at issue are not of historical importance. Given that Mr. Escobar is considered one of the biggest drug lords in the history of Colombia, and that his life has been fully scrutinized by the media, we expect that most facts about Mr. Escobar, particularly new ones, will receive national and international attention.

Second, we are not convinced that the purported distinction between historical facts and non-historical facts is legally sound.  Ms. Vallejo fails to cite any cases or authorities that support her proposition.  The cases that Ms. Vallejo relies on do not differentiate between historical facts and non-historical facts, and merely stand for the unremarkable proposition that a defendant cannot copy verbatim the plaintiff's work even if the work is considered non-fiction.  *See Harper & Row*, 471 U.S. at 548–49 (finding copyright infringement where the defendant admitted to copying verbatim portions of the plaintiff's work); *Scales v. Webb*, No. 1:15CV192, 2016 WL 1267756, *3 (M.D.N.C. Mar. 30, 2016) (finding that the defendant had copied verbatim substantial portions of the plaintiff's work, including unprotected facts and protected expression).

21

Third, in *Feist* the Supreme Court stated that "facts—scientific, historical, biographical, and news of the day" do not receive copyright protection. *Feist*, 499 U.S. at 347–48 (denying protection to historically non-significant telephone numbers). *See also* 1 Nimmer on Copyright § 2.11[A] (2019) (explaining that "[c]ourts have denied copyright protection not only to raw historical facts, but also to facts set forth in biographical works, in news stories, and in other forms of expression"). We decline the invitation to distinguish between so-called historical facts and so-called non-historical facts for purposes of copyright protection.

Ms. Vallejo next claims that the district court erred by not applying a modified substantial similarity standard when assessing whether substantial similarity exists between works in two different types of media. She relies on *Kustoff v. Chaplin*, 120 F.2d 551, 561 (9th Cir. 1941), and states that the correct test to measure whether two works in different media are substantially similar, and whether infringement of a literary story has occurred, is whether "an ordinary observer is led to believe that the film is a picturization of the story." Appellant's Br. at 41–42. Again, we disagree.

We do not believe that the test advanced in *Kustoff* still applies. Recent decisions from the Ninth Circuit have not applied such a modified standard, and have instead used the same substantial similarity test used in our circuit. *See Litchfield v. Spielberg*, 736 F.2d 1352, 1356–57 (9th Cir. 1984) (applying the substantial

22

similarity test between works from two different types of media—a musical play and a movie); *Berkic v. Crichton*, 761 F.2d 1289, 1292 (9th Cir. 1985) (applying the substantial similarity test between a book and a movie). *See also* 4 Nimmer on Copyright § 13.03[E][1] (stating that the ordinary observer or audience test has not been embraced by the federal courts of appeals). We therefore refuse to divert from our current substantial similarity test.

## IV

We affirm the district court's grant of summary judgment in favor of the defendants.

**AFFIRMED.**