In re Joseph A. TORCISE, Jr., Debtor.

Joseph A. TORCISE, Jr., d.b.a. Joe
Torcise Farms, Plaintiff–
Appellee,

v.

COMMUNITY BANK OF HOMESTEAD,
Defendant–Appellant.

In re GROWERS PACKING
COMPANY, Debtor.

GROWERS PACKING COMPANY,
Plaintiff–Appellee,

v.

COMMUNITY BANK OF HOMESTEAD,
Defendant–Appellant.

In re Joseph A. TORCISE, Jr., Debtor.

Joseph A. TORCISE, Jr., d.b.a. Joe
Torcise Farms, Plaintiff–
Appellant,

v.

COMMUNITY BANK OF HOMESTEAD,
Defendant–Appellee.

GROWERS PACKING COMPANY,
Plaintiff–Appellant,

v.

COMMUNITY BANK OF HOMESTEAD,
Defendant–Appellee.

In re Joseph A. TORCISE, Jr., Debtor.

Joseph A. TORCISE, Jr., d.b.a. Joe
Torcise Farms, Plaintiff–
Appellee,

v.

COMMUNITY BANK OF HOMESTEAD,
Defendant–Appellant.

GROWERS PACKING COMPANY,
Plaintiff–Appellee,

v.

COMMUNITY BANK OF HOMESTEAD,
Defendant–Appellant.

Nos. 92–4700, 92–4701, 92–
5149 and 92–5155.

United States Court of Appeals,
Eleventh Circuit.

July 7, 1997.

Robert M. Hustead, Marcus & Marcus, P.A., Homestead, FL, Alan c. Sundberg, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tallahassee, FL, D. Hywel Leonard, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tampa, FL, for Defendant-Appellant in No. 92–4700 and Defendant-Appellee in No. 92–5149.

Bruce S. Rogow, Ft. Lauderdale, FL, Beverly Pohl, Ft. Lauderdale, FL, Robert C. Gilbert, Coral Gables, FL, for Plaintiff-Appellee in Nos. 92–4700, 92–4701 and 92–5155 and for Plaintiff-Appellant in No. 92–5149.

Robert M. Hustead, Marcus & Marcus, P.A., Homestead, FL, for Defendant-Appellant in No. 92–4701.

Alan C. Sundberg, Carlton, Fields, Ward, Emmanuel, Smith & Cutler, Tallahassee, FL, for Defendant-Appellant in No. 92–5155.

Before EDMONDSON and BLACK, Circuit Judges, and HILL, Senior Circuit Judge.

HILL, Senior Circuit Judge:

This appeal relates to two adversary proceedings filed by the unsecured creditors committee of Chapter 11 debtors Joseph A. Torcise, Jr. (Torcise or Debtor) and Torcise's wholly-owned corporation, Growers Packing Company (Growers or Debtor), against Community Bank of Homestead (Bank), to set aside a fraudulent conveyance and recover a preference under federal and state bankruptcy law. For the following reasons, we remand this case with directions for a remittitur, or, at the option of Torcise and Growers, a new trial. In all other respects, we affirm the final judgment of the district court.

## I. BACKGROUND

Torcise was one of the largest tomato farmers in South Florida. He owned a 1,800–acre tomato farm in Homestead and a 600–acre farm near Immokalee. Torcise also was the sole shareholder of Growers, a tomato packing and shipping house near Homestead. Growers processed all of Torcise's tomatoes, as well as those of other farmers in the area.

In the late 1980's, Torcise's tomato farms and packing plant fell on hard times. Both had been operating at a substantial loss for several years. By the spring of 1989, Torcise faced a severe cash flow crisis involving a tomato crop then being harvested in Homestead and one on the vine in Immokalee. He also needed funds with which to keep his packing house operating. All told, Torcise had an immediate need for approximately three and one-half million dollars.

Torcise's options, however, either with financial institutions or individual lenders, were severely limited. At the time, Torcise and Growers already owed Bank almost

$700,000 in overdrafts. Torcise owed his brothers, Steven and Sam, $1.3 million.[1] He was also indebted to Bank stockholder and longtime friend, Vito Strano (whose brother, Rosario, was a Bank board member), $216,000. In addition, Torcise owed Bank director, officer, stockholder, and longtime friend, Kenneth Graves, $263,000. To make matters worse, the previous year, Torcise had committed a $4.3 million dollar check-kiting scheme against Bank that Bank had reported to federal and state banking authorities, the FBI, and the United States Attorney's Office.[2]

The record reflects that Bank knew, in the spring of 1989, that Torcise and Growers were insolvent by millions of dollars. Longtime Torcise friend and Bank chief executive officer, Robert Epling, testified that, at the time, Bank also knew that Torcise and Growers owed many trade creditors, and small farmers who had sold their tomatoes to Torcise and Growers but had not been paid. Unless Torcise obtained additional money to meet his cash flow crisis in Homestead and Immokalee, he and Growers could be forced to declare bankruptcy. Should this occur, Bank, the Torcise brothers, Strano, and Graves, as unsecured creditors, would be exposed to substantial loss.

Knowing Bank was anxious to be repaid, Torcise approached Bank with what he termed "an incentive situation."[3] Torcise testified that under his "lockbox"[4] scheme, Bank could lend him money indirectly through straw men, which it could not legally do directly. Bank would benefit from this scheme because it could protect its $700,000 in Torcise overdrafts by controlling the collection device into which Torcise would place his tomato receivables. In the final analysis, Bank and the straw men would be repaid

---

1. In January 1989, Bank set up a conduit loan, transferring this $1.3 million from Bank through Torcise's brothers to Torcise, who secured his brothers' loan by giving Bank a security interest in his tomato receivables.

2. Torcise wrote checks from his Community Bank account and deposited them into his Barnett Bank account. He then wrote checks from his Barnett Bank account and deposited them into his Community Bank account, reflecting apparent adequate balances in both accounts. Bank reported these overdrafts to the FDIC by filing a notice of apparent crime.

3. While the lock-box idea may have been his, Torcise testified that Epling was aware of and in favor of the plan because "Mr. Epling's overdraft would have been covered." Torcise's brother Steve testified that Epling knew, absent an infusion of money, Torcise's business could have "shut down," and, that the loans were made hastily, "in panic."

4. A lock-box is a collection device that captures a debtor's receipts in a locked post office box controlled by the lender. *In re: Rental Journal, Inc.,* 111 B.R. 1012 (Bankr.S.D.Fla.1989).

first and in full. So, on April 7, 1989,[5] Bank, Torcise, Strano, Graves, and Torcise's brothers instituted the lock-box scheme among themselves.[6] Bank lent $3.55 million, not to Torcise (on the face of the documents), but to Strano, Graves, and the Torcise brothers. Torcise and Growers executed written guarantees in favor of Bank. Pursuant to a separate pledge agreement (also dated April 7, 1989), Torcise and Growers pledged $7 to $8 million in accounts receivable to the borrowers (Strano, Graves, and the Torcise brothers), to secure the borrowers' debt to Bank. Once Bank funded the loans, the Torcise brothers, Strano, and Graves immediately funneled the money to Torcise, who deposit-

ed the loan proceeds into Growers' account at Bank. Torcise then used most of the money to repay his unsecured debts to Strano, Graves, and his brothers.[7]

Once the debts Torcise owed Strano, Graves, and his brothers were repaid, repayment to Bank under the lock-box system began. Acting as collection agent, Bank took charge of everything put into the lock-box.[8] In this manner, by controlling Torcise's and Growers' tomato receivables passing through the lock box, Bank was assured the repayment of $700,000 in Torcise overdrafts. Small tomato farmers, on the other hand, out of the lock-box loop, lost millions of dollars.[9]

5. Epling testified that although the Bank loans were made and funded on April 7, 1989, Bank's loan committee did not approve them until three days later.

6. The loan documents describe the arrangement as:

> The Borrower [the Torcise brothers, Graves, and Strano] and Guarantor [Torcise and Growers] represent that this loan is anticipated to be repaid through the accounts receivable of Guarantor as they are collected. The Borrower and Guarantor desire for Bank to attempt to collect and distribute the accounts receivable of Guarantor through the implementation of a lock box procedure ... Guarantor will direct each of its account debtors or other obligors to make payments due under the relevant accounts directly to a lock box to be under the control of Bank. Guarantor hereby authorizes and directs Bank to deposit into a special account (the "Lock Box Account") to be established and maintained with Bank, all checks, drafts, and cash payments received in the lock box. No deposits in the Lock Box Accounts shall constitute payment of any Liability unless and until irrevocably disbursed to Bank. Any avoidance of [sic, or ] setting aside of any payment made shall be the risk of Borrower and Borrower agrees to immediately indemnify Bank for any payments avoided or set aside ... [C]ollected funds shall be divided and disbursed as follows:

| | |
|---|---|
| Bank | 60% |
| Guarantor | 40% |

> Bank is then authorized and directed to disburse to itself said 60% proportional share and apply said proceeds to the loan accounts of the following individuals and in the following proportional percentage:

| Loan Account Borrower | [%] |
|---|---|
| Kenneth Graves | 21% |
| Vito Strano | 42% |
| Steve Torcise and | |
| Sam Torcise | 37% |

> Bank shall have sole control over any and all mail boxes of Guarantor, as they pertain to business. Guarantor will promptly deliver to Bank, for deposit into the Lock Box Account, all payments on accounts and other obligations received by Guarantor....
> * * *

The loan documents also contain an indemnification paragraph:

> Borrower and Guarantor jointly and severally agree to indemnify and hold harmless Bank from any claim, cause of action or liability of any kind, including attorneys' fees, which arise as a result or pertaining to Bank acting pursuant to this paragraph....

7. The loan documents stated that the purpose of the $1.3 million loan to Torcise's brothers was for the "financing of monies they had borrowed in January of '89." See note 1, infra. Bank CEO Epling testified that, because Strano was not indebted to Bank on April 7, 1989, the $1.5 million loan to Strano misrepresented its purpose as "refinancing existing debt with the balance being provided to the guarantor [Torcise] by the borrower." Epling testified that the debt that was actually being refinanced was a personal debt between Strano and Torcise. He testified that the loan agreement with Graves was similarly mischaracterized.

8. Bank and Torcise would jointly open Growers' post office box and the mail inside. Bank made copies of Growers' receivables checks; both Growers and Bank kept substantial, detailed records. Growers deposited the receivables into its account at Bank, identifying those payments attributable to Torcise's crop. Bank would then apply a percentage of the net amount of receivables attributable to Torcise's tomatoes to the debts owed Bank by the Torcise brothers, Strano, and Graves on a pro rata basis.

9. For example, Kern Carpenter, a tomato farmer doing business with Growers, now a claimant in the bankruptcy proceedings, was owed $1,554,-

During that spring, $7 to $8 million of Torcise tomato crop proceeds passed through the lock-box while subject to Bank's control. The $3.55 million in loans from Bank to Strano, Graves, and the Torcise brothers (including the $700,000 in Torcise overdrafts to Bank) were repaid in less than sixty days. Once paid, the lock-box scheme was discontinued and Bank released control of the receivables. Six months later, Growers and Torcise filed for bankruptcy under Chapter 11.

In December 1990, the committee of unsecured creditors (for the now bankrupt) Torcise and Growers, sought to recoup, for the benefit of the bankrupt estates, monies that it alleged Bank took from Torcise and Growers, and fraudulently applied to claims of Bank and Bank insiders, Strano, Graves, and the Torcise brothers. They filed suits in bankruptcy court against Bank to set aside a fraudulent conveyance on the grounds of actual fraud under federal and state law, and constructive fraud under federal law, 11 U.S.C. §§ 548(a)(1), (a)(2); *Fla. Stat.* § 726.01, and to recover a preference, 11 U.S.C. § 547. Damages claimed were $3.55 million plus interest.

Prior to trial, Bank moved to join one of Torcise's secured creditors, Bel–Bel International Corporation (Bel–Bel).[10] *See* Part II, *infra.* By joinder, Bank sought to avoid what it alleged as multiple liability exposure under Rule 19(a)(2)(ii), *Fed. R. Civ. Proc.* The bankruptcy court denied Bank's motion and the district court affirmed, on interlocutory appeal, the denial of joinder.

The Torcise and Growers bankruptcy estate cases were tried together in district court before the same jury in June 1992.[11] The jury rendered a verdict against Bank in the amount of the $3.55 million damages claimed. Bank appeals the jury verdict. Debtors' committee cross-appeals.

## II. THE BEL–BEL LAWSUIT

There is a factual twist. Two weeks before Torcise and Growers filed for bankruptcy, Bel–Bel filed suit in district court against Bank, Torcise, Growers, Strano, Graves, the Torcise brothers, and others. *Bel–Bel Intern. Corp. v. Barnett Bank of South Florida, N.A.,* 158 B.R. 252 (S.D.Fla.1993). Bel–Bel's suit arose out of a $2.5 million loan it made to Torcise in 1988. Its complaint alleged tort and conspiracy claims for money damages against Bank (and other non-Torcise defendants).[12] It alleged claims against Torcise on promissory notes, a bad check, conversion, and fraud. *Id.* Bel–Bel asserted crop liens and properly recorded security interests in the proceeds of Torcise's tomatoes, allegedly including funds repaid to Bank, and sought, *inter alia,* the recovery of those funds paid to Bank as subject to Bel–Bel's security interest. *Id.*

Claiming that Torcise's and Growers' bankrupt estates were necessary and indispensable parties in Bel–Bel's suit, as they sought to recover the value of the same receivables, Bank moved for joinder. The district court denied the motion giving several reasons: (1) Bel–Bel's cause of action was not identical to the committee of unsecured creditors' cause of action; (2) Bel–Bel's claims were state common law claims for intentional torts, not claims under bankruptcy law; (3) the doctrine of joint and several liability applied in Bel–Bel's case to the alleged co-tortfeasors; (4) the Bel–Bel action involved different parties than those in the action brought by the unsecured creditors committee; and (5) Bel–Bel and the unsecured creditors committee had conflicting interests in each matter. *Id.* at 256–57.

000. He testified that, while he knew loans were being made by Bank through the Torcise brothers, Strano, and Graves, he was unaware that the four men and Bank were to be repaid substantial earlier debts from those loan proceeds.

**10.** Related Bel–Bel corporations, New Lisbon Corporation, Prodin, Inc., and Overseas Professional Investments, Inc., were also originally named in the joinder motion.

**11.** In July and August, 1991, Bank's and Grower's motions to withdraw the reference in the adversary proceedings from the bankruptcy court to the district court were granted.

**12.** Bel–Bel claimed defendants' conduct amounted to impairment of collateral, conversion, and intentional interference with business relationships.

After a bench trial, the district court found for Bel–Bel on all of its tort claims and entered judgment against Bank for $2.5 million in compensatory damages and $300,000 in punitive damages.[13]

## III. ISSUES ON APPEAL AND STANDARDS OF REVIEW

The parties raise numerous issues on appeal and cross-appeal. Only three merit discussion:[14]

A. Whether the district court abused its discretion in affirming the bankruptcy court's denial of Bank's motion for joinder of Bel–Bel as an indispensable party on grounds of multiple or inconsistent liability. Rule 19(a)(2)(ii), *Fed.R.Civ.P.; Dean v. Barber,* 951 F.2d 1210, 1215 (11th Cir.1992);

B. Whether the district court committed reversible error in failing to submit a potential § 548(c) good faith defense instruction to the jury regarding fraudulent transfers under the bankruptcy code. 11 U.S.C. §§ 548(a)(1) and 548(c); *Johnson v. Bryant,* 671 F.2d 1276, 1280 (11th Cir.1982); and

C. Whether, under *Jones v. Miles,* 656 F.2d 103, 106 & n. 4 (5th Cir. Unit B Aug.1981), the general jury verdict of $3.55 million in favor of Torcise and Growers can withstand mathematical scrutiny as a preference.

## IV. DISCUSSION

A. *Joinder under Rule 19 of the Federal Rules of Civil Procedure*

Bank claims that Bel–Bel is required to be joined as a "person needed for just adjudication" under Rule 19(a)(2)(ii)[15] be-

cause its absence leaves Bank subject to the substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest. When the district court affirmed the bankruptcy court's denial of Bank's motion to join Bel–Bel, Bank contends that it was faced with a dilemma, *i.e.,* a $3.55 million judgment in favor of debtors, Torcise and Growers, and a $2.5 million judgment in favor of Bel–Bel. Bank argues that, by allowing two different parties to claim the right to the same receivables in separate suits, with two separate judgments ostensibly payable from the same fund (the tomato crop proceeds), Bank is being forced to disgorge the same fund twice. Bank concludes, therefore, that "remand is required" under Rule 19, with direction to join Bel–Bel.

Rule 19 provides for joinder of an indispensable party where there is substantial risk of the defendant being subjected to a multiplicity of suits. *Dudley v. Smith,* 504 F.2d 979, 983 (5th Cir.1974). It is well established under Rule 19 that all claimants to a fund must be joined to determine the disposition of that fund. *See Johnson v. Middleton,* 175 F.2d 535, 537 (7th Cir.1949). However, findings of indispensability must be based on stated pragmatic considerations, especially the effect on parties and on litigation. *Provident Tradesmens Bank & Trust Co. v. Patterson,* 390 U.S. 102, 106, 88 S.Ct. 733, 736, 19 L.Ed.2d 936 (1968); *Smith v. State Farm Fire and Cas. Co.,* 633 F.2d 401, 405 (5th Cir.1980). Rule 19 does not prevent the assertion of compelling substantive interests; it merely commands the courts to examine each controversy to make certain that the interests really exist. *Morrison v. New Or-*

---

**13.** Bank submitted a copy of Judge Nesbitt's *Bel-Bel* opinion to this panel requesting that we take judicial notice of her judicial act, finding Bank liable to Bel–Bel with respect to funds deposited into the lock-box at Bank. *See In re: Delta Resources, Inc.,* 54 F.3d 722, 725–26 (11th Cir. 1995). Bank has appealed the judgment for Bel–Bel, contending that, among other things, the district court erroneously failed to require joinder of the bankrupt estates as parties in that adversary proceeding. That appeal is presently pending.

**14.** All other issues are without merit and are affirmed without discussion, *see* 11th Cir. R. 36–1.

**15.** Rule 19(a)(2)(ii) states:

(a) *Persons to be Joined if Feasible.* A person who is subject to service of process and whose joinder will not deprive the court of jurisdiction over the subject matter of the action shall be joined as a party in the action if ... *(2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may ... (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest ....* (emphasis added).

*leans Public Service, Inc.,* 415 F.2d 419, 423 (5th Cir.1969). To say a court "must" dismiss in the absence of an indispensable party and that it "cannot proceed" without him puts the matter the wrong way around: a court does not know whether a particular person is "indispensable" until it has examined the situation to determine whether it can proceed without him. *Id.; Provident,* 390 U.S. at 119, 88 S.Ct. at 743.

We find that Bel–Bel was not an indispensable party in the action brought by Torcise and Growers for many reasons. First, the causes of action in the two suits are different. Bel–Bel's claims against Bank are tort and conspiracy actions for money damages. Torcise's and Growers' claims against Bank involve claims under federal and state bankruptcy law. *See Challenge Homes, Inc. v. Greater Naples Care Center, Inc.,* 669 F.2d 667 (11th Cir.1982); *cf. Haas v. Jefferson Nat. Bank of Miami Beach,* 442 F.2d 394, 398 (5th Cir.1971) (where the court, in applying Rule 19(a)(2)(ii), noted that a non-party's absence would result in less than a complete settlement of the controversy because a judgment in favor of Haas would leave the bank open to double liability).

A case cited by Bank, *Congress Credit Corp. v. AJC Intern., Inc.,* 42 F.3d 686 (1st Cir.1994), is distinguishable. In *Congress Credit,* AJC received preferential transfers from bankrupt debtor United Western. These transfers were subject to a factor's lien in favor of Congress Credit. Congress Credit filed suit against AJC in district court seeking to recover the preferential payments. It also sued the trustee in bankruptcy court. Congress Credit received a declaratory judgment that if the trustee won the preferential action, the proceeds would be subject to its lien. The First Circuit reversed the district court's dismissal of the lien enforcement case and consolidated the two cases. Unlike *Congress Credit,* here we have, not claims by two parties in two suits to the same preferential payments, but two causes of action, with different consequences and different mea-

sures of damages. *See Johnson,* 175 F.2d at 537.

Second, the responsible parties are different in each case. The Bel–Bel action includes the alleged co-tortfeasors, namely, Strano, Graves, and the Torcise brothers, among others, under the doctrine of joint and several liability. *See Jeffries v. Georgia Residential Finance Authority,* 678 F.2d 919, 929 (11th Cir.), *cert. denied,* 459 U.S. 971, 103 S.Ct. 302, 74 L.Ed.2d 283 (1982).

Third, Bank would have us believe that "the fund" is $3.55 million in tomato receivables. Bank argues that Bel–Bel's $2.5 million judgment must be paid from this finite $3.55 million fund, hence, double exposure to Bank. That contention is not supported by the record. Bank is confusing "benefit to themselves" with "damages to others." Torcise pledged $7 to $8 million in tomato receivables as security for Bank's $3.55 million loan to Strano, Graves, and the Torcise brothers. During the time Bank had control of the lock-box, at least $7 to $8 million in crop receivables passed through it. By our rough calculations, that leaves $3 to $4 million in the fund before, by definition, multiple liability can occur. It is immaterial that, once Bank and the straw men were paid, the lockbox arrangement was discontinued and Bank released control of the receivables.

*Mann v. City of Albany, Ga.,* 883 F.2d 999 (11th Cir.1989), cited by Bank, is also distinguishable. In this reverse discrimination suit, Mann sued the city, alleging that the refusal to hire him because he was white denied him equal protection. The refusal was made under the auspices of an affirmative action injunction. To avoid the risk of multiple obligations, the city was granted joinder of the class of black plaintiffs who had obtained the injunction. Here, for the reasons previously discussed, Bel–Bel's presence is not necessary to avoid such risk.[16]

We conclude that Bank's claims of multiple exposure are purely speculative. *See Evans v. American Surplus Underwriters Corp.,* 739 F.Supp. 1526, 1535 (N.D.Ga.1989). There is no substantial risk to Bank of incur-

---

16. Under the indemnification terms of the loan agreements themselves, if Bank both disgorges monies to Torcise and Growers *and* pays Bel-

Bel, Bank has reimbursement recourse against Strano, Graves, and the Torcise brothers.

ring multiple, inconsistent obligations as a result of absentee Bel–Bel's alleged interest. *Id.;* Rule 19(a)(2)(ii), *Fed. R. Civ. Proc.* The district court did not abuse its discretion in affirming the bankruptcy court's denial of joinder. *Dean,* 951 F.2d at 1215.

### B. *Jury Instructions*

■ Bank next complains that the district court committed reversible error in its failure to submit a potential § 548(c) good faith defense instruction to the jury, therefore improperly instructing them on fraudulent transfers under the bankruptcy code. 11 U.S.C. §§ 548(a)(1) and 548(c).[17] Bank claims that such reversible error entitles it to a new trial with correct instructions. It argues that the instructions given by the district court "effectively read out of the Bankruptcy Code," and denied to the Bank, the fundamental defense available under § 548(c), to a transferee who has acted in good faith and given value in exchange for the transfer. The majority of Bank's complaint is based upon the following statement made by the district judge from the bench:

[THE COURT:] If you find that the transfer of accounts receivable was done with an intent to hinder, delay or defraud other creditors of growers Packing Company, then you must enter a verdict in favor of Growers Packing Company.

If you find that the transfer of accounts receivable was done with an intent to hinder, delay or defraud other creditors of Joe Torcise doing business as Joe Torcise Farms, then you must enter a verdict in favor of Joe Torcise Farms. *The bank has no defense to a finding of actual fraud* (emphasis added).

Bank reads the instruction as telling jurors that "Bank [had] no defense to a finding of actual fraud [by the debtors]." It claims that it leaves no doubt in the jurors' minds that the § 548(c) defense did not apply to the § 548(a)(1) claims.

Torcise and Growers offer three arguments in rebuttal. First they contend that the § 548(c) defense was actually given to the jury three different times:

[THE COURT:] The bank maintains that it took the accounts receivable for value and in good faith. There could be no fraudulent transfer recovery against a creditor to the extent that the creditor takes property in good faith, and in exchange for value given by the creditor of the debtor.

Knowledge of the debtors' insolvency may alone demonstrate lack of good faith and defeat the bank's defense. The presence of any circumstance placing the bank on inquiry as to the financial condition of the debtor may also defeat the bank's defense of being a good faith transferee that provided value.

\* \* \*

If you find that the transfers of accounts receivable was made with the actual fraudulent intent, then you must find in favor of the plaintiff or plaintiffs in this claim, unless you find in favor of the defendant on his defense, that it took the pledge of accounts receivable in good faith and for reasonably equivalent value, the instruc-

---

**17.** Section 548(a)(1) permits a trustee to avoid any transfer of a debtor's interest in the property if the debtor:

(1) made such transfer ... with actual intent to hinder, delay or defraud any entity to which the debtor was, or became, on or after the date that such transfer was made, ... indebted....

11 U.S.C. § 548(a)(1). Transfers are voidable if the debtor:

(a)(2)(A) received less than a reasonably equivalent value in exchange for such transfer or obligation; and

\* \* \*

(a)(2)(B)(i) was insolvent on the date that such transfer was made or such obligation was incurred or became insolvent as a result of such transfer or obligation....

11 U.S.C. §§ 548(a)(2)(A); (a)(2)(B)(i). The bankruptcy code provides a defense for

claims under § 548 to those who, in good faith and for value, received debtor-transferred property:

Except to the extent that a transfer or obligation voidable under this section is voidable under section 544, 545, or 547 of this title, a transferee or obligee of such transfer or obligation that takes for value and in good faith has a lien on or may retain any interest transferred or may enforce any obligation incurred, as the case may be, to the extent that such transferee or obligee gave value to the debtor in exchange for such transfer or obligation.

11 U.S.C. § 548(c).

tions previously given on what is good faith, what constitutes reasonably equivalent value are applicable here.

Each of the plaintiffs has also sued the bank for constructive fraud under state law. Florida law says a transfer is constructively fraudulent if the debtor made the transfer without receiving a reasonable equivalent value in exchange for the transfer and the debtor was insolvent on the date of the transfer or became insolvent as a result of the transfer.

* * *

If you find that either one of debtors did not receive reasonable equivalent value in exchange for the transfer, and that the transfer was made at a time when the debtor was insolvent, or became insolvent as a result of said transfer, then you must find in favor of the plaintiffs, that proves its or the state law constructive fraud clam, unless you find in favor of the bank on one or more of the defenses, one, a transfer of obligation is not voidable against a person who took in good faith and for a reasonably equivalent value or against any subsequent transferee.

Next, Torcise and Growers contend that the instruction given was correct, i.e., that actual fraud is inconsistent with good faith, therefore, by definition, actual fraud precludes consideration of a § 548(c) good faith defense. They argue that, if the jury believed that Bank's actions in formulating and carrying out the April 7, 1989, loan transaction were fraudulent, then Bank could not have been acting in § 548(c) good faith. Torcise and Growers contend that the § 548(a)(1) instruction enabled the jury to look at the intent of both the transferor and the transferee and, if the jury found no actual fraud by those parties, then, and only then, could it consider a good faith defense on Bank's part. Finally, Torcise and Grower assert that the district court's failure to submit the § 548(c) defense to the jury was harmless error due to the substantial evidence of actual fraud by Bank in the record.

It has long been the law of this circuit that jury instructions must be viewed as a whole. *Andry v. Farrell Lines, Inc.,* 478 F.2d 758 (5th Cir.1973) (citations omit-

ted). Furthermore, "[w]e apply a deferential standard of review to a district court's jury instructions." *Bateman v. Mnemonics, Inc.,* 79 F.3d 1532, 1543 (11th Cir.1996) (citations omitted). If the charge in general correctly instructs the jury on the law, even though a portion is technically imperfect, no harmful error is committed. *Miller v. Universal City Studios, Inc.,* 650 F.2d 1365, 1372 (5th Cir. 1981); *Bolden v. Kansas City Southern Ry. Co.,* 468 F.2d 580 (5th Cir.1972). Additionally, a jury need be instructed on a legal theory only if the evidence adduced at trial is sufficient to justify the instruction. *Bank South Leasing, Inc. v. Williams,* 778 F.2d 704 (11th Cir.1985) (citations omitted). We must reverse an erroneous instruction, however, if we are "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Johnson v. Bryant,* 671 F.2d 1276, 1280 (11th Cir.1982) (quoting *Miller,* 650 F.2d at 1372).

Viewed as a whole, we hold that the instructions given by the district court, or the instructions allegedly not given, are not cause for reversible error. *See Andry,* 478 F.2d at 758. Where debtors are guilty of fraud, as is true in the present case, there are two possible scenarios *vis-a-vis* Bank. First, Bank itself, may have been found guilty of fraud. In that case, Bank has no good faith defense to the receipt of a fraudulent transfer. *See In re: Roco Corp.,* 701 F.2d 978, 984 (1st Cir.1983), *aff'g,* 21 B.R. 429 (1st Cir.BAP (R.I.)1982) (where, for purposes of § 548(c), a transaction is not made in good faith if the earmarks of an arms-length transaction are missing). The defense of good faith does not arise until Bank has avoided a finding that it, as well as Torcise and Growers, was guilty of fraud. On the facts of this case, fraud and good faith are mutually exclusive. *See Max Sugarman Funeral Home, Inc. v. A.D.B. Investors,* 926 F.2d 1248, 1256 n. 13 (1st Cir.1991) (transferees could not satisfy the good faith requirement of § 548(c) where they were privy to the "fraudulent purposes" of the transfers to them). Secondly, Bank may not have been guilty of fraud, but nevertheless, did not act in good faith. In that case, Bank also loses. *See id.; cf. In re: Roco Corp.,* 701 F.2d at 984 (where

fraudulent intent of the transferee may be imputed to the transferor where the transferee is in a position to control the disposition of the property). We recognize that cases may well arise where the omission of a good faith defense instruction would be reversible error. However, in this case, while legally available, there is no factual basis for such an instruction.

We have meticulously reviewed the record as a whole. *Andry,* 478 F.2d at 758. The evidence is clear that Bank, Strano, Graves, and the Torcise brothers knew that, in 1989, Torcise and Growers were insolvent by millions of dollars. *See Sugarman,* 926 F.2d at 1256 n. 13. It is also apparent from the record that Torcise and Growers were guilty of fraud, *see In re: Roco Corp.,* 701 F.2d at 984, and that Bank, Strano, Graves, and the Torcise brothers were privy to and had knowledge of this fraud. *See Sugarman,* 926 F.2d at 1256 n. 13. Furthermore, as Bank was in the unique position of control as to the disposition of the tomato receivables, *see In re: Roco Corp.,* 701 F.2d at 984, it was an integral part of the fraud. *Id.* In the final analysis, small tomato farmers, not included in the lock-box scheme, lost millions of dollars, while Bank and its insiders conspired to be repaid first and in full. *Id.* The evidence therefore would not have supported a finding that Bank acted in good faith. We conclude that any error committed by the district court in failing to submit a § 548(c) good faith defense instruction on the actual fraud claim to the jury was harmless, *Miller,* 650 F.2d at 1372, as we are not "left with a substantial and ineradicable doubt as to whether the jury was properly guided in its deliberations." *Johnson,* 671 F.2d at 1280.

C. *District Court's Use of a General Verdict*

■ Bank next claims that the $3.55 million general jury verdict in favor of Torcise and Growers cannot pass "mathematical muster" as a preference award and must be set aside. Bank claims that Torcise and Growers concede that to establish a preference, they must prove the payment of a

debtor's antecedent debt before the transfer was made. 11 U.S.C. § 547(b)(2).

It is Bank's contention that when the lockbox scheme was instituted in April 1989, the maximum antecedent debts owed by Torcise and Growers to Bank, Strano, Graves, and the Torcise brothers, totalled $2.253 million,[18] not $3.55 million. Bank argues that as Torcise and Growers insisted upon the use of a general verdict form, they now bear the burden of justifying the jury's "incomprehensible" verdict on all counts, *Jones v. Miles,* 656 F.2d 103, 106 & n. 4 (5th Cir. Unit B Aug. 1981), and they cannot do so.

Torcise and Growers contend that if the $3.55 million award can be mathematically justified under another theory, *i.e.,* fraudulent transfer, then the award is valid. They cite no cases for this proposition.

■ The law is well settled in this circuit that if "the judge accepts a general verdict in a case containing multiple issues, the verdict is immune from attack only as long as the evidence under each count is sufficient to authorize the result." *Royal Typewriter Co. v. Xerographic Supplies Corp.,* 719 F.2d 1092, 1098 (11th Cir.1983) (citing *Jones,* 656 F.2d at 106 n. 4; *see Smith v. Southern Airways, Inc.,* 556 F.2d 1347 (5th Cir.1977)).

In conclusory fashion, Torcise and Growers argue that the jury had multiple theories upon which to base its verdict and that the evidence and instructions supported each theory. They claim that Charlie Jones, alleged to be another insider, was also paid $1 million by Torcise from the proceeds of the $3.55 million as a preferred creditor. The evidence does not reflect this. However, even with Jones, Torcise and Growers are still $.3 million short of $3.55 million.

We conclude that Torcise and Growers have not born their burden of justifying the jury's general verdict in the context of a preference. *Jones,* 656 F.2d at 106. We hold that the maximum award which the evidence will support is $2.253 million. Therefore, we remand this case to the district court with directions that it require a remittitur in the amount of $1.297 million, or,

---

**18.** This figure is composed of: Growers' overdraft ($195,000); Torcise's overdraft ($472,000); Strano debt ($216,000); Graves debt ($263,000); and the Torcise brothers debt ($1,107,000).

at the option of Torcise and Growers, order a new trial.

## V. CONCLUSION

Based upon the foregoing, we conclude that the district court did not abuse its discretion in affirming the bankruptcy court's denial of Bel–Bel's joinder. We also conclude, based upon a thorough review of the record, that any error committed by the district court in failing to submit a § 548(c) good faith instruction to the jury was harmless, and not reversible, error. However, as the maximum award that the evidence will support is $2.253 million, we remand this case to the district court with directions that it require a remittitur in the amount of $1.297 million, or at the option of Torcise and Growers, order a new trial. In all other respects, we affirm the final judgment of the district court.

AFFIRMED IN PART, REVERSED IN PART, AND REMANDED.