[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT

FILED

U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
12/15/98
THOMAS K. KAHN
CLERK

No. 96-4598

D. C. Docket No. 89-2510-CIV-LCN

BEL-BEL INTERNATIONAL CORP.,

Plaintiff -Appellee-Cross-Appellant,

versus

COMMUNITY BANK OF HOMESTEAD, KENNETH
GRAVES, VITO STRANO, GROWERS PACKING
COMPANY, JOSEPH TORCISE, and CODELIA TORCISE,

Defendants-Appellants-Cross-Appellees.

Appeals from the United States District Court
for the Southern District of Florida

**(December 15, 1998)**

Before TJOFLAT and BIRCH, Circuit Judges, and RONEY, Senior Circuit Judge.

TJOFLAT, Circuit Judge:

This case is one of many arising out of the bankruptcy of a Florida tomato farming

operation owned by Joe Torcise.[1]  The case before us involves one set of creditors converting

---

[1] Other reported cases include <u>Torcise v. Community Bank of Homestead</u> (<u>In re Torcise</u>),
116 F.3d 860 (11th Cir. 1997); <u>Community Bank of Homestead v. Torcise</u> (<u>In re Torcise</u>), 187

property that was pledged as collateral to another creditor. We hold that there is no bar to requiring the converting creditors to return the property they converted, and therefore affirm the judgment of the district court.

## I.

Joe Torcise owned two tomato farms – one in Homestead, Florida, and the other in Immokalee, Florida. He also owned Growers Packing Company, which packed his tomatoes and those of several other farmers.

In the late 1980s, Torcise began facing financial difficulties. In response, he started "check-kiting" – he wrote checks from one bank account to another, and then wrote checks from the second account back into the first, thus artificially inflating the balances of both accounts. In November 1988, one of the banks involved in this process – Community Bank of Homestead – discovered the check-kiting, but only after honoring $4.3 million of Torcise's bad checks. In an attempt to recoup its losses, Community Bank persuaded Torcise to sign a promissory note (dated November 18, 1988) for the amount of the overdrafts. The collateral for this note was the accounts receivable (the "receivables") of the Homestead and Immokalee tomato crops for the coming winter and spring, respectively.[2]

---

B.R. 18 (S.D. Fla. 1995); Torcise v. Community Bank of Homestead, 131 B.R. 503 (S.D. Fla. 1991); Torcise v. Riff (In re Growers Packing Co.), 150 B.R. 82 (Bankr. S.D. Fla. 1993); and Torcise v. Cunigan (In re Torcise), 146 B.R. 303 (Bankr. S.D. Fla. 1992).

[2] The Homestead farm yielded a winter crop; the Immokalee farm yielded both a fall and a spring crop.

Torcise also sought to deal with his financial problems through more legitimate means, namely, by seeking new sources of capital. Torcise received unsecured loans from a number of sources, including defendants Kenneth Graves and Vito Strano, and Steven and Sam Torcise ("the Brothers"). Another source of funding was Bel-Bel International Corporation, a small Panamanian corporation created by a Venezuelan family for the purpose of investing in the United States. On November 29, 1988, Bel-Bel loaned $2.5 million to Torcise and his wife, Codelia, secured by a first priority security interest in the Homestead tomato crop for the coming winter – the same crop that Torcise had pledged as collateral to Community Bank.[3] The loan documents included a representation by Torcise that the collateral was unencumbered, and provided that Torcise would not further encumber this collateral without Bel-Bel's consent.

One of the terms of Bel-Bel's loan was that Torcise was to provide a "good standing letter" from his other lenders indicating that his loans were not in default. Bel-Bel received such a letter from Community Bank on December 8, 1988, stating that none of Torcise's loans were in default. Conspicuously absent from the letter was any mention of Torcise's $4.3 million in overdrafts resulting from his check-kiting activity, or of the loan given to cover those overdrafts.

By the end of 1988, Torcise had fully repaid the $4.3 million note to Community Bank (thereby extinguishing Community Bank's claim on the Homestead receivables[4]), using receipts from the Immokalee fall crop. This speedy repayment, however, strained Torcise's cash flow to

---

[3] Bel-Bel actually made two separate loans to Torcise, one for $2 million and one for $500,000 two months later. Both loans were made on the same terms; they are treated as a single $2.5 million loan for the purpose of this opinion.

[4] The district court held that this claim was never adequately established in the first instance; the repayment of the note makes the issue moot for the purposes of this appeal.

3

the point that it became difficult for him to meet his current operating expenses. Consequently, in March 1989, Torcise lacked the resources to harvest the spring crop at his Immokalee farm, or to keep Growers Packing operating such that any tomatoes picked at Immokalee could be marketed.

In response to this problem, Community Bank arranged a complex financing scheme with Torcise and some of his creditors. Community Bank lent a total of $3.55 million to Strano ($1.5 million), Graves ($750,000), and the Brothers ($1.3 million). These individuals then gave the money to Torcise. Over $3.2 million of this money was immediately returned to Strano, Graves, and the Brothers as partial repayment for pre-existing debts.[5] Community Bank then created a "lock-box" account into which the receivables for Torcise's Homestead crop would be deposited. Sixty percent of this account was to be used to repay the $3.55 million loan from Community Bank; the remaining forty percent was to be released to Torcise for use in harvesting the Imokalee crop.[6] At the time that this arrangement was made, all of the participants were aware that the receivables from Torcise's Homestead crop had been pledged previously to Bel-Bel.

Between April 6 and May 24, 1989, approximately $5 million in receivables from the Homestead crop was deposited into the lock-box account. Of this amount, almost $3.6 million was used to repay the Community Bank loan.

The Bel-Bel note came due on June 1, 1989. Torcise was unable to pay. Consequently, Bel-Bel agreed to extend Torcise's repayment schedule through August 18. Torcise was still

---

[5] The $3.55 million loan thus operated in essence as a consolidation loan.

[6] This ratio was later changed to 70/30.

4

unable to pay. Bel-Bel then filed suit in the Southern District of Florida on November 13, 1989, against Torcise and his wife, Growers Packing Company, Community Bank, Graves, and Strano.[7] A few weeks later, Torcise, his wife, and Growers Packing Company filed for Chapter 11 bankruptcy.[8] The bankruptcy judge granted relief from the automatic stay of litigation proceedings against the bankrupts, and allowed Bel-Bel's suit to proceed.[9]

Following a bench trial, the district court found Torcise and his wife liable to Bel-Bel for payment of the $2.5 million note. Torcise was also found liable for fraudulent inducement based on his representation that the Homestead tomato crop was unencumbered, when it had in fact previously been pledged to Community Bank as collateral for the $4.3 million note to cover Torcise's overdrafts. In additon, the court found that Bel-Bel still had a security interest in the Homestead crop receivables, and therefore that Bel-Bel could demand those receivables from Community Bank, Graves, and Strano in repayment of Torcise's debt.[10] The district court additionally found these defendants liable for impairment of collateral, tortious interference with the contractual relationship between Bel-Bel and Torcise, civil conversion, and conspiracy to

---

[7] Bel-Bel also sued other persons, including the Brothers; these persons have since settled out of the case.

[8] Joe Torcise and Growers Packing filed for bankruptcy on November 30, 1989; Codelia Torcise filed on December 7, 1989. The bankruptcy proceedings were jointly administered.

[9] The commencement of bankruptcy proceedings automatically stays any pending litigation against the debtors. See 11 U.S.C. § 362 (1994).

[10] This holding was based on Florida Statutes chapter 679.306(2), a part of the Uniform Commercial Code that governs a secured party's rights upon the disposition of its collateral.

commit these torts.[11]  Finally, Community Bank was held liable for fraudulent nondisclosure, based on its failure to disclose Torcise's overdrafts in the "good standing letter."

The defendants were held jointly and severally liable for compensatory damages, consisting of principal and accrued interest on the $2.5 million note at the time the lock-box account was created, and prejudgment interest at the statutory rate from the date of the creation of the lock-box account to the date on which the district court entered its "findings of fact and conclusions of law."[12]  In addition, punitive damages were assessed against Community Bank ($300,000), Graves ($50,000), and Strano ($50,000).

All defendants appeal, and Bel-Bel cross-appeals.  Parts II and III of this opinion dispose of some preliminary matters raised by the defendants – claims that the district court lacked subject matter jurisdiction and that the case should have been dismissed for failure to join necessary parties.  Part IV addresses the substantive appeals of Community Bank, Graves, and Strano, focusing on the district court's holding that they are liable for conversion.  Part V discusses the issues raised by Torcise on appeal, and part VI discusses Growers Packing's claim that the judgment against it is void.  Finally, part VII addresses the issues raised by Bel-Bel's cross-appeal.

II.

---

[11] Growers Packing Company was also found to be part of this conspiracy.

[12] This sum was reduced slightly by settlement recoveries received by Bel-Bel from other defendants.

The defendants' initial challenge to the district court's decision is that the parties in this case are not completely diverse, and thus the district court lacked subject matter jurisdiction over the case. Federal jurisdiction in this case is premised on diversity of citizenship. See 28 U.S.C. § 1332(a) (1994). Diversity jurisdiction requires that the plaintiff be a citizen of a state (or nation) different from that of any of the defendants. See Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 267, 2 L.Ed. 435 (1806). For purposes of diversity jurisdiction, a corporation is "a citizen of any State by which it has been incorporated and of the State where it has its principal place of business." 28 U.S.C. § 1332(c)(1) (1994). A corporation's principal place of business is determined by looking at the "total activities" of the corporation. See Village Fair Shopping Ctr. Co. v. Sam Broadhead Trust, 588 F.2d 431, 434 (5th Cir. 1979).[13]

Defendants concede that Bel-Bel is incorporated in Panama (and is therefore a Panamanian citizen) and that none of the defendants are Panamanian citizens. Defendants argue, however, that Bel-Bel's principal place of business is Florida, and therefore Bel-Bel, in addition to being a Panamanian citizen, is a Florida citizen. The defendants point out that Bel-Bel's only investment was in Florida, that Bel-Bel maintained a bank account in Florida, and that Bel-Bel had an accountant and attorneys in Florida. Many of the defendants in this case are also Florida citizens; therefore, the defendants argue that complete diversity is lacking and the district court did not have jurisdiction. In response, Bel-Bel contends that its principle place of business is Venezuela (not Florida), and therefore complete diversity is present. Bel-Bel points out that all of its shareholders were Venezuelan citizens, that Bel-Bel was not involved in the day-to-day

---

[13] In Bonner v. City of Prichard, 661 F.2d 1206, 1209 (11th Cir. 1981) (en banc), this court adopted as binding precedent all decisions of the former Fifth Circuit handed down prior to October 1, 1981.

7

operation of the Florida tomato farm, and that Bel-Bel's corporate decisionmaking took place in Venezuela. The district court, after holding an evidentiary hearing on the matter, found that Bel-Bel's principle place of business was Venezuela. We review this finding for clear error. See Vareka Invs., N.V. v. American Inv. Properties, Inc., 724 F.2d 907, 910 (11th Cir. 1984).

The evidence suggests that Bel-Bel is, in essence, a small corporation designed as a vehicle through which a handful of Venezuelan investors could make loans to the Torcises' Homestead, Florida, tomato farm. Thus, the money and the management were based in Venezuela. Bel-Bel's operations in Florida, meanwhile, consisted of only those things necessary to monitor its investment. In such a situation, the evidence was sufficient to support the district court's finding that Bel-Bel's "principal place of business" was Venezuela. See id. (affirming the district court's finding of diversity on similar facts).

Furthermore, this is not the type of situation that section 1332(c)(1)'s "principal place of business" doctrine was intended to address. That requirement was intended to prevent local businesses from avoiding local trials simply because they were incorporated in Delaware (or another foreign jurisdiction), and to reserve diversity jurisdiction for parties that are sufficiently foreign to have a legitimate fear of local prejudice. See S. Rep. No. 1830 (1958), reprinted in 1958 U.S.C.C.A.N. 3099, 3102. In the case at hand, Bel-Bel has substantial indicia of being a foreign corporation, and is thus not the type of organization that Congress, in enacting section 1332(c)(1), intended to keep out of federal court.

Thus, in light of the policy behind 28 U.S.C. § 1332(c)(1) and Bel-Bel's substantial Venezuelan connections, we hold that the district court did not commit clear error in finding that Bel-Bel's principle place of business was in Venezuela. The parties were therefore completely

diverse, and the district court properly exercised subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a)(2).

III.

The defendants also allege that the district court erred in denying Community Bank's motion under Rule 19 of the Federal Rules of Civil Procedure to require joinder of certain necessary parties. Specifically, the defendants claim that the bankruptcy estates of the Torcises and Growers Packing were necessary parties to this action under Rule 19(a)(2)(ii), which requires that parties be joined in an action if disposition of the action in that party's absence may "leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations."[14] Fed. R. Civ. P. 19(a)(2)(ii). The defendants argue that the receivables sought by Bel-Bel are the same as those sought by the bankruptcy estates (on a fraudulent conveyance or preference theory) in certain adversarial litigation in the bankruptcy court; not joining the estates in Bel-Bel's suit thus created a substantial risk of double liability.

Community Bank made essentially the same argument in the bankruptcy court, there arguing that Bel-Bel was a necessary party to the adversarial bankruptcy litigation, because a judgment for both the estates and Bel-Bel would lead to double liability. The bankruptcy court

---

[14] Rule 19 actually contemplates a two-part inquiry. First, the court is to use the criteria in Rule 19(a) to determine whether a party ought to be joined. See Fed. R. Civ. P. 19. If so, and if joinder of that party is impossible, the court is to use the criteria in Rule 19(b) to determine whether the court should nevertheless proceed in that party's absence. See id. Because the district court did not find that the bankruptcy estates met the criteria of Rule 19(a), it did not reach the Rule 19(b) question.

rejected the argument, and the district court affirmed the bankruptcy court on an interlocutory appeal. Community Bank appealed that decision to the Eleventh Circuit, which also concluded that Rule 19 did not require the joinder of Bel-Bel in the adversarial bankruptcy litigation.[15] See Torcise v. Community Bank of Homestead (In re Torcise), 116 F.3d 860, 865-67 (11th Cir. 1997). This decision is squarely "on point" with the issue raised in this appeal; we are therefore bound by it and thus reject defendants' appeal of the district court's denial of Community Bank's Rule 19 motion.[16] See Cargill v. Turpin, 120 F.3d 1366, 1386 (11th Cir. 1997) (holding that a prior panel decision is binding on subsequent panels).

---

[15] The panel reasoned that Bel-Bel was not a necessary party in the bankruptcy litigation because (1) the suits alleged different causes of action – the bankruptcy litigation involved fraudulent conveyance and preference claims, while this action involves tort claims; (2) the responsible parties were different in each case – Strano and Graves were not in the bankruptcy litigation; and (3) Community Bank had improperly acquired control over a sufficient amount of receivables to be able to pay Bel-Bel $2.5 million and pay the estates $3.55 million without incurring double liability. See Torcise v. Community Bank of Homestead (In re Torcise), 116 F.3d 860, 866 (11th Cir. 1997).

[16] This decision also controls our resolution of defendants' related claim that the judgment rendered in the adversarial bankruptcy proceeding (based on the fraudulent conveyance and preference allegations) is res judicata as to Bel-Bel's claims in this suit. According to the defendants, Bel-Bel's claims in this suit are identical to those at issue in the adversarial bankruptcy litigation. Thus, Bel-Bel should have raised those claims in the adversarial bankruptcy litigation (even though it was a not party). Because Bel-Bel did not, and because the adversarial bankruptcy proceeding resulted in a final decision on the merits, res judicata bars the raising of the claims in this action.
    This claim is essentially a restatement of the argument that Bel-Bel was a necessary party in the bankruptcy litigation. Almost by definition, a party whose claim would be extinguished by a decision in an action (under res judicata) is a necessary party to that action under Rule 19. The prior panel decision in In re Torcise thus dictates that we reject the res judicata claim. Cf. Bel-Bel Int'l Corp. v. Barnett Bank of S. Fla., N.A., 158 B.R. 252, 257-58 (S.D. Fla. 1993) (rejecting defendants' res judicata claim in this case using reasoning similar to that by which In re Torcise rejected defendants' Rule 19 argument).

We also note that the risk of double liability in this case is largely illusory. If Bel-Bel obtains relief as a creditor in the bankruptcy proceedings before the defendants have satisfied Bel-Bel's judgment in this case, the defendants can challenge Bel-Bel's attempt to obtain satisfaction of the judgment on that ground and presumably reduce their payments by whatever amount Bel-Bel obtains in bankruptcy. See Hurley v. Gaertner (In re Hurley), 158 B.R. 115, 122 (N.D. Ill. 1993) (noting that "courts possess the power 'in all cases to compel credits on judgments or executions, where it would be illegal or inequitable to proceed to collect the amount claimed'") (quoting Sandburg v. Papineau, 81 Ill. 446 (1876)). If Bel-Bel has not obtained relief as a creditor in the bankruptcy proceedings when the defendants satisfy the judgment, then the defendants can claim an equitable lien or constructive trust on whatever amount from the estates is allocated to Bel-Bel. Cf. United States v. Cannistraro, 694 F.Supp. 62, 72 n.11 (D.N.J. 1988), vacated in part, 871 F.2d 1210 (3d Cir. 1989) (noting that constructive trusts are applied in numerous contexts to prevent unjust enrichment). In either case, the defendants would not be subject to double liability.

IV.

Bel-Bel's primary claim against defendants Community Bank, Graves, and Strano was conversion. Conversion is "the exercise of wrongful dominion or control over property to the detriment of the rights of the actual owner." Seymour v. Adams, 638 So.2d 1044, 1046-47 (Fla. 5th DCA 1994). A lienholder is considered to be an "owner" for the purposes of conversion if he has a present right of possession. See Farmer's Home Admin. v. Dino (In re Dino), 17 B.R. 316, 318 (Bankr. M.D. Fla. 1982); Dekle v. Calhoun, 53 So. 14, 15 (Fla. 1910). Bel-Bel had a present

11

right of possession to the receivables from the Homestead tomato crop by virtue of Torcise's defaults.[17] Community Bank, Graves, and Strano exercised control over these receivables. The exercise of control was wrongful because the receivables had been previously pledged to Bel-Bel as security, and (under the security agreement) the defendants did not have the right unilaterally to take control of those receivables. The exercise of control was also to the detriment of Bel-Bel, which lost the money that otherwise would have provided repayment for the loan. Thus, Bel-Bel had a strong claim for conversion.

The defendants, however, argue that Bel-Bel's conversion claim was barred by the "specific fund" requirement: "To state a claim for the conversion of money, there must exist a specific fund capable of separate identification." Bankest Imports, Inc. v. ISCA Corp., 717 F.Supp. 1537, 1542 (S.D. Fla. 1989). According to the defendants, the money received by Torcise for the Homestead tomato crop was dispersed among several parties, and as a result there is no specific fund that Bel-Bel can claim was converted. The cases upon which the defendants rely, however, all involve contractual rights to payments for which no particular source was specified – i.e., the payment money could come from anywhere. See Advanced Surgical Techs., Inc. v. Automated Instruments, Inc., 777 F.2d 1504, 1505 (11th Cir. 1985); Gambolati v. Sarkisian, 622 So.2d 47, 50 (Fla. 4th DCA 1993); Belford Trucking Co. v. Zagar, 243 So.2d 646, 648-49 (Fla. 4th DCA 1970). In the case before us, there was a specific, identifiable fund – the receivables from the Homestead crop – in which Bel-Bel had a property right and from which

---

[17] The security agreement between Bel-Bel and Torcise gave Bel-Bel the right to take control of the receivables in the event of default. The district court found that, at the time the "lock-box" arrangement was instituted, Torcise had "numerous prior defaults." This finding is not challenged.

12

Bel-Bel was entitled to be repaid when Torcise defaulted. The specific fund requirement thus placed no bar on Bel-Bel's claims. Cf. Allen v. Gordon, 429 So.2d 369, 371 (Fla. 1st DCA 1983) (allowing a conversion action for a specific sum of money improperly transferred from one bank account to another).

Furthermore, the policy underlying the specific fund requirement makes it inapplicable to Bel-Bel's claim. The specific fund requirement is an exception to the general rule that an obligation to pay money cannot be enforced through an action for conversion. See Capital Bank v. G & J Invs. Corp., 468 So.2d 534, 535 (Fla. 3d DCA 1985). This general rule is an expression of the principle that "an action in tort is inappropriate where the claim is based on a breach of contract." Douglas v. Braman Porsche Audi, Inc., 451 So.2d 1038, 1039 (Fla. 3d DCA 1984). There was no contractual relationship between Bel-Bel and the persons who converted the receivables from the Homestead tomato crop; therefore, Bel-Bel's claim could not be characterized as an attempt to transform a breach of contract action into a tort action. Bel-Bel's claim was thus not the type of claim to which the specific fund requirement was intended to apply.

In addition to being held liable for conversion, Community Bank, Graves, and Strano were held liable for tortious interference and impairment of collateral, and Community Bank was held liable for fraudulent nondisclosure.[18] The remedy granted for each of these torts, however, was identical to the remedy granted for conversion – joint and several liability for the $2.5

---

[18] Each of these defendants was also held liable for punitive damages, see supra part I; those holdings are not challenged.

13

million for which Bel-Bel was secured, plus interest.[19]  In essence, Bel-Bel sought the same relief on a variety of legal theories.  Therefore, in light of our affirmance of the district court's holding regarding conversion, we do not need to reach the defendants' appeals regarding Bel-Bel's other claims.

V.

Defendants Joseph and Codelia Torcise were held liable for payment of the $2.5 million note plus interest.  The Torcises challenge this holding on two grounds.  First, they claim that the bankruptcy court's relief from the automatic stay did not give Bel-Bel leave to pursue its claim on the note; rather, the relief from stay permitted Bel-Bel to pursue only its fraud claim.  Second, the Torcises argue that Bel-Bel was not entitled to any interest on this claim that accrued after they filed for bankruptcy.

The bankruptcy court's order granting relief from stay concluded, without exception, that Bel-Bel's suit in district court should proceed.  This suit included Bel-Bel's contractual claim against the Torcises for repayment of the note.  We therefore hold that the district court did not err in entertaining this claim.  In addition, Bel-Bel, as a secured creditor, was entitled to post-petition interest on its claim.  See 11 U.S.C. § 506(b); Orix Credit Alliance, Inc. v. Delta Resources, Inc. (In re Delta Resources, Inc.), 54 F.3d 722, 727 (11th Cir. 1995).  The district court therefore properly held the Torcises liable for interest that accrued on their debt after they filed their bankruptcy petition.

---

[19] The joint and several liability results from the district court's holding that the defendants were liable for conspiracy to commit the alleged torts.  This holding is not challenged.

Joe Torcise also challenges the district court's holding that he is liable for fraudulent inducement.[20] The relief granted on this claim, however, was the same as that for the contractual claim – $2.5 million plus interest. Fraudulent inducement thus operated as an alternative holding; having affirmed on the primary holding (the contractual claim), we do not need to address the alternative legal theory on which the district court granted relief.

VI.

Growers Packing Company was held to be part of the conspiracy to convert funds belonging to Bel-Bel, see supra note 11, and was therefore held jointly and severally liable for the $2.5 million note, plus interest. In response, Growers Packing argues that Bel-Bel was not granted relief from the automatic stay against litigation as to Growers Packing, and thus any judgment against it is void.

Growers Packing raised this issue for the first time after the district court issued its "findings of fact and conclusions of law," but before the district court issued a final judgment. The final judgment was issued without reference to Growers Packing, but the district court withheld jurisdiction to determine whether Growers Packing should be added to the judgment.

---

[20] The district court found that Torcise had misled Bel-Bel as to the status of its collateral (the Homestead tomato crop) by claiming in the loan documents that the collateral was unencumbered, when it had in fact been pledged to Community Bank as security for the $4.3 million note to cover Torcise's overdrafts. The district court also found that this misrepresentation had induced Bel-Bel to make the loan.

15

Bel-Bel then filed a motion to amend the judgment to include Growers Packing; the motion was granted.[21]

We review the grant of a motion to amend a final judgment for an abuse of discretion. See Barnes v. Southwest Forest Indus., Inc., 814 F.2d 607, 611 (11th Cir. 1987). We find no such abuse here. Growers Packing was a party to this action when the motion for relief from stay was before the bankruptcy court. Growers Packing was also a party to the jointly-administered bankruptcy actions. The stay order did not omit Growers Packing when declaring that Bel-Bel's district court litigation would be permitted to proceed. It was therefore reasonable for the district court to conclude that Growers Packing was included in the relief from stay order, and that judgment against Growers Packing was therefore appropriate.

VII.

Bel-Bel cross-appeals the denial of a motion to amend its complaint to add an allegation of civil theft. The amendment of pleadings is left to the discretion of the trial court. See

---

[21] The issue of whether Growers Packing was included in the relief from the automatic stay should have been raised in a motion to amend Growers Packing's answer, not in a motion to amend the judgment. If Bel-Bel was not in fact granted relief from the automatic stay as to Growers Packing, then Bel-Bel violated the stay by filing a lawsuit against Growers Packing. Such a violation would be an affirmative defense for Growers Packing. See, e.g., Barr v. Overmyer (In re Overmyer), 121 B.R. 272, 275-76 (Bankr. S.D.N.Y. 1990); Redmond v. Redmond, 718 A.2d 668, 676 (Md. Ct. Spec. App. 1998). Growers Packing did not, however, assert this affirmative defense in its answer. Thus, the proper course for the district court to have taken would have been to recognize Growers Packing's argument as an attempt to amend its answer. Such an attempt might have been denied as untimely. If the motion had been granted, but followed by a rejection of the argument on the merits, we would be presented with a question of law (the interpretation of the bankruptcy court's relief from stay order) that we would review de novo. Our conclusion would nevertheless be the same – that Growers Packing was included in the relief from stay, and therefore the district court was correct in permitting Bel-Bel's claims against Growers Packing to proceed. Thus, the district court's procedural error was harmless.

Technical Resource Servs., Inc. v. Dornier Med. Sys., Inc., 134 F.3d 1458, 1463-64 (11th Cir. 1998). In this case, the district court found that the proposed amendment was untimely and redundant. In light of the numerous counts alleged in the complaint and the fact that the motion to amend came several years after the initial complaint was filed, the district court's finding did not constitute an abuse of discretion.

Bel-Bel also appeals the calculation of interest on the amended final judgment.[22] The amended final judgment stated that prejudgment interest would run through August 30, 1995 (the date on which the district court issued its "findings of fact and conclusions of law"), and that postjudgment interest would begin accruing as of the date of the amended final judgment (April 16, 1996). This resulted in a gap of nearly eight months for which Bel-Bel was awarded neither prejudgment nor postjudgment interest.

A prevailing party is entitled, under Florida law, to prejudgment interest. See Argonaut Ins. Co. v. May Plumbing Co., 474 So.2d 212, 214-15 (Fla. 1985). Prejudgment interest is, by definition, interest that accrues until judgment is rendered. Because final judgment was not rendered in this case until April 16, 1996, Bel-Bel was entitled to prejudgment interest at the statutory rate that had accrued until that date.

The defendants argue that Bel-Bel waived this objection to the amended final judgment by not raising it in the district court. We disagree. Bel-Bel properly raised the issue of interest

---

[22] There were two "final" judgments in this case – the "final judgment" and the "amended final judgment." The amended final judgment disposed of certain motions that were made after the final judgment was entered.

17

simply by requesting it;[23] Bel-Bel is now entitled to raise on appeal any errors concerning the district court's resolution of its request.

## VIII.

We remand this case to the district court with instructions to provide for prejudgment interest accruing until the date of the amended final judgment. In all other respects, the judgment of the district court is AFFIRMED.

SO ORDERED.

---

[23] Furthermore, Bel-Bel explicitly raised the issue of the appropriate dates for prejudgment interest in its reply to the defendants' post-trial motions.